J-S03035-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: W.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.R., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1182 WDA 2024 |

Appeal from the Order Dated August 30, 2024
In the Court of Common Pleas of Washington County Orphans' Court at
No(s): No OC-2023-01608

BEFORE: KUNSELMAN, J., SULLIVAN, J., and BECK, J.

MEMORANDUM BY BECK, J.:                    **FILED: FEBRUARY 3, 2025**

J.R. ("Father") appeals from the order entered by the Washington County Orphans' Court ("orphans' court") terminating his parental rights to W.R. ("Child"), born November 2021, pursuant to 23 Pa.C.S. § 2511(a)(2), (8), and (b).[1]  We affirm.

The orphans' court set forth the relevant underlying facts as follows:

> [Child] was born [in November 2021] to [Father] and [Mother (collectively "Parents")].  The day after his birth, … [Child] came into the care of Washington County, Children and Youth Social Service Agency [("Agency")] via Shelter Order.  The Order set forth the following facts in support of emergency protective custody:
>
> > On November 30, 2021, the Agency received a referral regarding concerns for parental substance abuse.  [Mother] tested positive for marijuana on October 26, 2021.  [Mother]

---

[1] The order also terminated the parental rights of Child's mother, C.E. ("Mother").  Mother has not filed an appeal from that decision.

> denied substance use and stated that the positive drug screen was due to second-hand smoke ingestion. [Mother] has an extensive history with [the Agency] and Allegheny County CYF. Her rights were involuntary terminated to two of her children in March of 2021, due to a complete lack of compliance with all court ordered services. …
>
> [Father] is a Tier 1 Megan's Law offender charged with Indecent Assault of a Person Less than 13 years of Age in 2009. [Father] could not provide details of any previously completed treatment. …
>
> The Agency would have safety-related concerns should [Child] remain in the home of [Mother] due to the previous concerns of the Agency not being rectified and [Mother's] lack of necessary treatment services. Furthermore, the Agency would have safety-related concerns should [Child] remain in the home of [Father] due to his criminal record, Megan's Law status, and lack of proof of sufficient offenders counseling.

**See** Shelter Care Order of December 1, 2021. The Shelter Order alleged that [] Child was without proper care, custody or control.

> Visitation for Parents was ordered as supervised a minimum of twice per week with each visit being two hours in duration and a maximum, of twice per week with each visit being three hours. Visitation was to be line-of-sight at all times supervised by a case aide, caseworker or provider pending further order of court….
>
> [Child] was adjudicated dependent on February 2, 2022[,] and placed in Foster Care with [M.F. ("Foster Mother") and B.F. (collectively "Foster Parents")], where he remains to date. Visitation for Parents was ordered as supervised visitation a minimum of twice per week with each visit being two hours in duration and maximum of twice per week with each visit being three hours. A stipulation was attached to Father's visitation ordering that visits would commence upon the Agency's receipt of a sentencing order that states Father is permitted to have contact with children. …
>
> Subsequent to the adjudication, five Permanency Review Hearings were held on the following respective dates: July 28,

2022, November 17, 2022, March 9, 2023, September 5, 2023[,] and December 15, 2023.

At the July 28, 2022, Permanency Review Hearing, Mother was found to have made substantial progress, while Father made no progress toward alleviating the circumstances which necessitated the original placement. Mother was found to be substantially compliant, and Father was found to be minimally compliant. …

Father's status as a Megan's Law Offender expired during this review period. Nevertheless, Father did not engage in a drug and alcohol evaluation, nor did he engage in anger management. Father did complete an individual and interactional evaluation with Dr. [Neil] Rosenblum, wherein he was diagnosed with Unspecified Trauma and Stressor Related Disorder, Rule-Out Panic Disorder with Agoraphobia, History of Cannabis Use Disorder; Antisocial Personality Traits; History of Adult Antisocial Behavior; and Parent/Child Relational Problem. Father was compliant with random drug testing but tested positive for cannabinoids prior to obtaining a medical marijuana card. During this review period Father did not exercise consistent visitation due to his varying work schedule during the week. In an effort to accommodate Father, th[e orphans' c]ourt ordered that one visit occur on the weekend.

Mother's visitation was ordered as supervised three times per week with each visit being line-of-sight, two hours in duration and a maximum of three. Father was ordered to have identical visitation to Mother, with the exception of Mother being given the opportunity to expand to include one bookended visit at the agreement of all parties. …

The next Permanency Review Hearing was held November 17, 2022. Mother was found to be in full compliance with the permanency plan with substantial progress. Father was found to be in substantial compliance with moderate progress. …

During this review period[,] Father completed an updated drug and alcohol assessment at SPHS CARE Center and appropriately engaged in drug and alcohol treatment. Father was compliant with random drug testing and obtained a medical marijuana card. It was noted that Father exercised consistent visitation with W.R. and Mother. Visits were reported to be

positive. During this period, visitation remained the same, but Parents were given the opportunity for expansion with the agreement of the Agency and [Guardian Ad Litem ("GAL")].

The next Permanency Review Hearing was held on March 9, 2023. Mother made substantial progress during this review period. Though Mother's visitation with W.R. was consistent, issues were reported with visits. On January 31, 2023, the Agency received a report from the visitation supervisor that the home had an odor of marijuana. The report indicated that Father admitted to the provider that he drank alcohol that day, a "Twisted Tea" in particular. It was reported that Father became verbally aggressive with the provider. Mother quickly removed [Child] from the home, as the incident ensued. On February 14, 2023, Father was observed leaving [his] residence during Mother's unsupervised visit time. Father was restricted from attending the unsupervised visitation between Mother and [Child.]

Father made moderate progress during this review period. During this period [Father] engaged in outpatient dual-diagnosis treatment at the SPHS CARE Center. His counselor reported he was compliant with his attendance and his treatment plan. Father was also compliant with random drug testing. He tested positive for cannabinoids and negative for illicit substances. Father did have a valid medical marijuana card at the time. Father completed the Nurturing Parenting Education Program through Justice Works Youth Care on January 25, 2023[,] and began the Nurturing Parenting with Substance Abuse Education Program. Father's counsel informed [the orphans' court] that he has removed all alcohol from the home and will not have any in the home going forward.

It was reported that, upon returning from a Christmas visit supervised by Parents' relatives, Foster Parents reported that [Child] smelled of marijuana. Parents denied smoking medical marijuana in the home and attributed the smell to the neighbors.

Mother's visitation was ordered as unsupervised three times per week with each visit being three hours in duration and to occur at the parent's home. Father's visitation was ordered as two supervised visits per week with each visit lasting three hours in duration. In addition, Father was permitted one partially supervised (bookended) visit with [Child]. The bookended visit was ordered [to] be three hours in duration with the first and last

thirty minutes supervised by a provider. Th[e orphans' c]ourt granted Father permission to expand visits by beginning to attend Mother's unsupervised visitation upon the future agreement of all parties.

On June 22, 2023, upon the consent of all parties, Father was granted partially supervised visitation with [Child] no less than three times per week with each visit being no less than three hours in duration and the first and last thirty minutes of each visit being supervised by a provider. Father was also granted permission to be present during Mother's visitation.

The next Permanency Review Hearing took place on September 5, 2023. Mother was found to be in substantial compliance with the permanency plan and to have made moderate progress. … Father was not assessed for progress or compliance during this review period. Th[e orphans' c]ourt heard testimony by Dr. [] Rosenblum[.] … Dr. Rosenblum indicated that [Child] accompanied Parents to the evaluation room but became upset [and] screamed when he realized that his [F]oster [P]arents later left the room. Dr. Rosenblum noted that Father was not actively engaged with [Child] until the end of the visit. Mother was more engaged and understood the importance of engaging in a learning activity. Dr. Rosenblum took concern with the fact that Parents did not engage [Child] linguistically, in consideration of his speech needs. He further testified that Father does not believe in developmental therapy. Furthermore, Father feels that [the Agency] involvement is unwarranted, and Father is reported to engage in a pattern of negativity.

Dr. Rosenblum testified that Father takes little responsibility for his past actions and this compromises his ability to parent [Child]. Dr. Rosenblum indicated that Father exhibits limited parenting skills. Instead of taking full advantage of his visit time with [Child], Father invites other family members to his visits to see [Child]. Dr. Rosenblum testified that Father is critical of professionals, defensive, reluctant to change and has an unrealistic image of himself.

He further opined that Foster Parents provide exceptional care for [] Child and found that [Child's] primary attachment is to Foster Parents. Dr. Rosenblum testified that Parents would need to demonstrate much more significant progress in order to reunify with [Child].

Kara Geyer, Blueprints Assistant Mentor and Visit Supervisor also provided testimony. She indicated that she has worked with Father three times a week since December 2022. Geyer noted that during visits Father plays with [Child] using age appropriate play, cooks for him and shows him affection. Father adheres to redirection and has indicated a desire to work with [Child] to increase his speech. Geyer noted that Father uses electronic devices during visits and fails to prepare an organized plan for visits.…

Father testified that he does not want his son to go to [] school, but he supports him receiving an education. Father continued that he never stated that he did not want his son to receive services. Father requested an alternative specialist as he stated that the one currently servicing him made him feel uncomfortable. Father also stated that [Child] only receives 30 minutes of screen time during visits and he does not allow [Child] to consume junk food.

Orphans' Court Opinion, 8/30/2024, at 2-10 (citations and footnotes omitted).

On October 11, 2023, arguing that he is unable to parent Child due to his failure to comply with the goals in the permanency plans. Following multiple hearings,[2] at which seven witnesses testified,[3] the orphans' court

---

[2] Attorney Erin Dickerson ("Attorney Dickerson") entered her appearance as counsel for Child. Attorney Dickerson also indicated that she is Child's GAL, and that there was no conflict of interest in her ability to represent both the best and legal interests of Child. N.T., 4/18/2024, at 4; *see also In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020) (stating that "where an orphans' court has appointed a GAL/[c]ounsel to represent both the child's best interests and legal interests, appellate courts should review sua sponte whether the orphans' court made a determination that those interests did not conflict").

[3] One of the witnesses testified to sexual assault allegations against Father by a since deceased minor. The record reflects that, on January 18, 2024 the GAL presented a petition for special relief on behalf of Child, noting that the Agency received information that Father was a named perpetrator in an
*(Footnote Continued Next Page)*

terminated Mother's and Father's parental rights under sections 2511(a)(2), (8), and (b). Father filed a timely notice of appeal. Both Father and the orphans' court complied with Pennsylvania Rule of Appellate Procedure 1925.

Father argues that the orphans' court erred in terminating his parental rights. Father's Brief at 3.[4] His entire argument consists of the following:

> In the present case, [Father] did participate, in good faith, in the services requested by the [Agency]. [Father], despite a heavy work schedule, did attend as many visits as possible with [Child]. By the fall of 2023, because of [Father's] participation and good faith effort, the [Agency] could have recommended that [Child] be placed either with the Mother or [Father]; yet, [the Agency] did not do so.

*Id.*

"It is well[]settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority." *In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017). Here, Father failed to develop an argument challenging the termination of his parental rights under sections 2511(a)(2), (5), (8), or (b). Therefore, Father waived his claims. *See id.* at 466; *see also In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to

---

allegation of sexual abuse against a minor female. The orphans' court noted that the Agency "unfounded the report because the minor making the allegations had died." Orphans' Court Opinion, 8/30/2024, at 12 n.5.

[4] Father's Brief does not include a Statement of Questions Involved, in contravention of Pa.R.A.P. 2116(a).

develop the issue in any other meaningful fashion capable of review, that claim is waived.") (citation omitted).

Even if not waived, any claim that the orphans' court abused its discretion or erred in rendering its decision is meritless. In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the [orphans'] court if they are supported by the record, but it does not require the appellate court to accept the [orphans'] court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the [orphans'] court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the [orphans'] court's decision, the decree must stand. We have previously emphasized our deference to [orphans'] courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the [orphans'] court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 255 A.3d 343, 358-59 (Pa. 2021) (quotation marks, brackets, and citations omitted).

Termination of parental rights is governed by 23 Pa.C.S. § 2511, which requires a bifurcated analysis. *See C.M.*, 255 A.3d at 359. "Initially, the

focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a)." ***In re C.M.K.***, 203 A.3d 258, 261-62 (Pa. Super. 2019) (citation omitted). If the orphans' court determines the petitioner established grounds for termination under section 2511(a) by clear and convincing evidence, the court then must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013). Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Matter of Adoption of L.C.J.W.***, 311 A.3d 41, 48-49 (Pa. Super. 2024) (citation omitted).

As stated above, the orphans' court terminated Father's rights to Child pursuant to section 2511(a)(2) and (8). Orphans' Court Opinion, 8/30/2024, at 32. "This Court may affirm the [orphans'] court's decision regarding the termination of parental rights with regard to any one subsection of [s]ection 2511(a)." ***In re J.F.M.***, 71 A.3d 989, 992 (Pa. Super. 2013). We focus our analysis on subsection (a)(2), which provides as grounds for termination of a parent's rights:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

Termination of a parent's rights pursuant to section 2511(a)(2) requires that the petitioner show, by clear and convincing evidence, that the parent is presently unable to care for the child and will not be able to care for him for the foreseeable future. *Int. of A.R.*, 311 A.3d 1105, 1112 (Pa. Super. 2023).

> A child has a right to a stable, safe, and healthy environment in which to grow, and the child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting. When a parent has demonstrated a continued inability to conduct her life in a manner conducive to providing a safe environment for a child, and the behavior is irremediable as supported by clear and competent evidence, the termination of parental rights is justified.

*Id.* at 1111.

The orphans' court provided the following explanation for its decision to terminate Father's parental rights under section 2511(a)(2):

> [Child] was adjudicated dependent on February 2, 2022. … While th[e orphans' c]ourt does acknowledge that Parents have made limited improvements throughout the course of [Child's] dependency, it is clear from the record and evidence provided that their incapacities and refusals will not be remedied and will consequently leave [] Child without essential parental care, control or subsistence necessary for his or her physical or mental well-being. …
>
> [W]hile Father has been reasonably cooperative, he does not take responsibility for [Child's] dependency.
>
> [Father] has completed mental health counseling, two parenting programs, and anger management amongst other services. Father has never taken initiative for [Child's] medical treatments or therapies and does not show an understanding of his needs. Father has never taken an opportunity to know more about Child's needs and does not take Child's developmental

- 10 -

needs seriously. … [Agency Caseworker Julie] Bower believes that Father has completed the services he has been asked to do but the knowledge he has absorbed is questionable. Bower further expressed that there are concerns that Parents are not able to meet [Child's] needs and as such [Child's] development would regress.

During the [hearing], th[e orphans' c]ourt also heard testimony from [Child's] [o]ccupational therapist who offered that Parents do not implement all of the therapeutic techniques recommended for [Child].

Th[e orphans' c]ourt finds the testimony of Dr. Rosenblum and Bower persuasive and opines that despite the services that have been provided to Parents, the incapacities and refusals that initially left [Child] without essential care cannot be remedied by Parents within a reasonable period, leaving [Child] without essential parental care, control or subsistence necessary for his physical and mental well-being. As stated, 2511(a)(2) grounds may include acts of incapacity to perform parental duties. Parents have displayed an inability to fulfill [Child's] needs even while putting forth efforts to do so. While Parents' efforts may be sincere, genuine intentions under (a)(2) will not preserve parental rights ….

For the above reasons th[e orphans' c]ourt finds that the Agency has met its burden under 2511(a)(2) as to … Father.

Orphans' Court Opinion, 8/30/2024, at 25-27.

The record supports the orphans' court's conclusion. The record reflects that Child has developmental delays and behavioral problems commensurate with his speech delays and an inability to communicate. N.T., 4/18/2024, at 75. Kristen King ("King"), the service coordinator the Department of Human Services, worked with Mother, Father, and Foster Parents. *Id.* at 30. King noted that Father had told a therapist that "he had no intention of sending [Child] to school, and that all he needed to do or to learn was to fish, hunt or

kill." *Id.* at 55. Further, King noted that when Child needed more intensive services, Foster Mother was the only person to accommodate Child. *Id.* at 56. Father's unwillingness to participate in services gave King concerns that he would not implement any necessary techniques to aid Child. *Id.* at 63-64.

Dr. Rosenblum indicated Child would qualify as a special needs child and needs "additional help from his caregivers in learning to help him develop coping skills to improve his language and communication skills[.]" *Id.* at 80. Dr. Rosenblum opined that it was detrimental to Child for Parents not to attend his therapies, as they were unable to develop skills to understand Child's needs and respond to them. *Id.* at 80-81. Dr. Rosenblum indicated that without these skills, he did not have confidence that they could provide "suitable care" for Child. *Id.* at 82. Dr. Rosenblum further noted that Father has to work on his anger issues and irritability, take ownership of his problems, and work on his alcohol and drug issues. *Id.* at 89. Dr. Rosenblum noted that Father's comments about Child not needing to go to school and all he needed to do was to learn to fish and hunt and kill was not consistent with parenting improvements. N.T., 4/24/2024, at 29-30.

Bower, Child's caseworker, testified that Child was diagnosed "with having trauma or other stress-related disorder as well as a language disorder." N.T., 4/25/2024, at 35. She stated that Child's speech is "noticeably delayed" and Foster Mother sought early intervention services. *Id.* Bower noted that Father did not learn about Child's developmental or medical needs, or try to

be part of Child's treatment and medical appointments. *Id.* at 33, 58, 102. Bower testified that Father did not take any initiative regarding Child's medical, educational, or social activities. *Id.* at 51. Although Father had completed services he had been asked to do, Bower questioned how much knowledge he had absorbed. *Id.* at 27-32, 76-86.

Based on the foregoing, our standard of review, and the orphans' court's credibility determinations, the evidence of record supports the orphans' court's determination that Father is not able to presently parent Children and will be unable to do so for the foreseeable future. *See A.R.*, 311 A.3d at 1112. We therefore find no abuse of discretion in the orphans' court's finding that the Agency presented clear and convincing evidence in support of termination pursuant to section 2511(a)(2).

We next consider whether the record supports the orphans' court's conclusion that there was clear and convincing evidence to terminate Father's rights pursuant to section 2511(b). Section 2511(b) provides:

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

Our analysis focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. *T.S.M.*, 71 A.3d at 267. "[T]he determination of the child's needs

- 13 -

and welfare requires consideration of the emotional bonds between the parent and child. The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond." *Id.* (quotation marks omitted). It is not enough that there exists a bond between parent and child to avoid termination. *See Interest of K.T.*, 296 A.3d 1085, 1109 (Pa. 2023). Rather, the trial court must determine whether the bond is "necessary and beneficial" to the child, such that "maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* at 1105-06. Focusing upon the "child's development, and mental and emotional health," the trial court should assess whether severing the bond "is the kind of loss that would predictably cause extreme emotional consequences or significant, irreparable harm" to the child. *Id.* at 1110-11.

Additionally, "the parental bond is but one part of the overall subsection (b) analysis[.]" *Id.* at 1113. The needs and welfare analysis must also include the consideration of factors such as: "the child's need for permanency and length of time in foster care …; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." *Id.* (citations omitted). "These factors and others properly guide the court's analysis of the child's welfare and all [their] developmental, physical, and emotional needs." *Id.* Importantly, "[orphans'] courts have the discretion to place appropriate

weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs." ***Id.***

Thus, a court must examine the matter from the child's perspective, placing his "developmental, physical, and emotional needs and welfare above concerns for the parent." ***Id.*** at 1105. "[T]he law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved." ***T.S.M.***, 71 A.3d at 268-69. The party seeking termination bears the burden of proving, by clear and convincing evidence, that termination of parental rights serves a child's needs and welfare. ***K.T.***, 296 A.3d at 1105.

With respect to its needs and welfare analysis, the orphans' court explained:

> [Child] looks to Foster Parents to meet his daily physical and emotional needs. Per the testimony of [Bower,] [Child] will go [to] Foster Mother for comfort and security even while in the presence of Mother. [Child's] primary attachment is to Foster Parents and he has formed a strong bond with them. In contrast, while evidence establishes a familiarity and closeness with Mother and Father, particularly with Mother, the level of attachment fails to rise to the level of existing, necessary[,] and beneficial. …
>
> Dr. Rosenblum offered similar sentiments. He opined that [Child's] primary attachment is to Foster Parents. Severing the bond between Foster Parents and [Child] would cause emotional distress for [Child]. Furthermore, [Child's] emotional adjustment and development would be at great risk if the bond between Foster Parents were severed and Parents could not meet his needs.
>
> Based upon the above, t[he orphans' c]ourt finds that the Agency has established through clear and convincing evidence the elements of [section] 2511(b).

- 15 -

Orphans' Court Opinion, 8/30/2024, at 31-32.

The record confirms the orphans' court's conclusion. Dr. Rosenblum testified that Child enjoys a "very close relationship" with his Foster Parents and that he has been in their home since his birth. N.T., 4/18/2024, at 74. Dr. Rosenblum did not see any issues with Child staying with Foster Parents, noting that their bond is "a very strong primary bond." *Id.* at 76; *see also id.* at 77 (noting that Child is attached to Foster Parents and they meet his needs). Dr. Rosenblum testified that when Child is with Parents, he "seemed fine," but when he realized Foster Parents were not there, he covered his eyes and screamed. *Id.* at 77. Dr. Rosenblum noted that although Parents calmed Child down, Child's separation from Foster Parents was "uncomfortable." *Id.* at 77-78. Dr. Rosenblum further highlighted that Father sat on a chair and occasionally spoke to Child, but did not interact with him until the end of the session. *Id.* at 78.

Bower testified that he tends to cling to Foster Mother even while Parents are in the room and that Child will go to Foster Mother for comfort and security. N.T., 4/25/2024, at 49-50. Bower indicated that Foster Parents meet Child's daily needs, and although he has a love and affection for Father, Child has a "very strong bond and primary attachment" to Foster Parents. *Id.* at 50, 59.

Based on the record before us and the standard of review we must employ, we discern no abuse of discretion in the orphans' court's conclusion

that Child is bonded to the Foster Parents, that they best meet Child's needs and welfare, and that Child will not be irreparably harmed by terminating Father's parental rights. ***See K.T.***, 296 A.3d at 1113. Further, the evidence demonstrates that Father did not engage in a caregiving role or meet Child's developmental needs. ***See In re P.Z.***, 113 A.3d 840, 852 (Pa. Super. 2015) (finding termination of parental rights supported under section 2511(b) where child was familiar with parent, but no attachment existed and parent did not have a history of engaging in a caregiving relationship with child or taking responsibility for child over an extended period). Accordingly, we conclude that the orphans' court did not err or abuse its discretion in determining that Child's developmental, emotional, and physical needs and welfare are best met by terminating Father's parental rights. As the orphans' court's determination pursuant to section 2511(b) is supported by the record, we must affirm the orders terminating Father's parental rights to Child. ***See C.M.***, 255 A.3d at 358-59.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 2/3/2025