J-S03036-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: B.W.P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1194 WDA 2024 |

Appeal from the Order Entered July 24, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000260-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: K.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: B.W.P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1195 WDA 2024 |

Appeal from the Order Entered July 24, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000261-2021

BEFORE: KUNSELMAN, J., SULLIVAN, J., and BECK, J.

MEMORANDUM BY BECK, J.:                    **FILED: APRIL 25, 2025**

B.W.P. ("Father") appeals from the orders entered by the Allegheny County Court of Common Pleas ("orphans' court") granting the petitions to terminate his parental rights to M.P., born August 2017, and K.P., born December 2018, (collectively "Children"), pursuant to 23 Pa.C.S. §

J-S03036-25

2511(a)(2), (5), (8), and (b).[1]  Because we conclude that the orphans' court did not abuse its discretion in terminating Father's parental rights, we affirm.

The Allegheny County Office of Children, Youth, and Families ("CYF") first became involved with the family in April 2019, after a Mercy Behavioral Health caseworker observed M.P. put marijuana in her mouth.  CYF identified Father's mental health, intimate partner violence between the parents, and both parents' substance use as concerns.  CYF obtained emergency custody of Children and placed them in a foster home in May 2019.  After a shelter care hearing in June 2019, the orphans' court ordered Children to remain in foster care.

CYF filed petitions for dependency, and after a hearing, the juvenile court adjudicated Children dependent in July 2019.  Father's court-ordered goals and Family Service Plan goals included, inter alia, participating in mental health treatment, obtaining stable housing, completing a substance use evaluation and a batterer's intervention program, participating in coached parenting, and engaging in supervised visits with Children.  Father was also ordered to sign release of information forms ("ROIs"), with his mental health providers, comply with probation, and allow CYF to obtain information from his probation officer.  After numerous permanency review hearings, the court

---

[1] The orphans' court also terminated the parental rights of mother, C.U. ("Mother").  Mother has not appealed this decision.

- 2 -

determined that Father had demonstrated only moderate compliance with his goals.

Children had psychological and medical issues that led to some complications with their foster care placements. Specifically, K.P. had an ADHD diagnosis, for which she was receiving psychiatric care, and exhibited aggressive behaviors as well as fits of rage. M.P. often took cues from K.P.'s behavior and would engage in similar aggressive outbursts, though with less frequency and severity. M.P. also had eye development issues that, according to her treating optometrist, will eventually require a surgery and additional medical care. In July 2021, CYF moved Children into a foster home with J.M. and N.M. ("Foster Parents"). On December 22, 2021, CYF filed petitions to involuntarily terminate Father's parental rights. In the petitions, CYF noted that Father has longstanding mental health issues, his progress and stability in mental health treatment was unknown, and he did not maintain consistent contact with Children.

In April 2023, CYF moved Children to a new foster home placement in Mercer County after Foster Parents expressed concerns about their ability to effectively address K.P.'s behavioral health needs. CYF and KidsVoice (acting as the child advocate) noted their concerns regarding K.P.'s extensive

psychiatric care[2] during the Mercer County placement, which led CYF to contact Foster Parents to see if they were again willing to serve as a placement for Children. Foster Parents accepted and confirmed that they had additional support in place to effectively address K.P.'s needs, and Children returned to Foster Parents' home in December 2023.

The orphans' court held evidentiary hearings on the termination petitions on June 6, 2024 and July 23, 2024,[3] at which several CYF caseworkers, two of Father's medical providers, a child and forensic psychologist, and Father testified.[4] The orphans' court issued separate orders involuntarily terminating Father's parental rights to M.P. and K.P. pursuant to 2511(a)(2), (5), (8), and (b). Father filed a timely appeal and both he and the orphans' court have complied with Rule 1925 of the Pennsylvania Rules of Appellate Procedure.

---

[2] Specifically, CYF and KidsVoice were concerned that the foster parents in that placement were overtreating and overmedicating K.P., who had been seen by ten different psychiatric providers at that point.

[3] The hearing on the termination petitions was originally to be held on January 19, 2022, but it was continued on multiple occasions because of Children's movement between foster homes.

[4] At the hearing on June 6, Attorney Erin Krotoszynski of KidsVoice stated that she had not identified a conflict that would prohibit her office from serving as both guardian ad litem ("GAL") and legal counsel for Children. N.T., 6/6/2024, at 8. *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020) (stating that "where an orphans' court has appointed a GAL/[c]ounsel to represent both the child's best interests and legal interests, appellate courts should review sua sponte whether the orphans' court made a determination that those interests did not conflict").

Father raises the following issues for our review:

1. Did the trial court abuse its discretion and/or err as a matter of law by involuntarily terminating Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. § 2511(b)?

Father's Brief at 4.

Our standard of review regarding the involuntary termination of parental rights is well settled:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will.

*Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 48 (Pa. Super. 2024) (citation omitted).

This Court's review of termination of parental rights decisions involves a bifurcated analysis as required by section 2511 of the Adoption Act. *Id.*

Initially the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence

- 5 -

that the parent's conduct satisfies the statutory rounds for termination delineated in section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (citation omitted). Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* at 48-49 (citation omitted).

As noted above, the orphans' court terminated Father's parental rights to Children pursuant to section 2511(a)(2), (5), and (8). However, we "need only agree with [the orphans' court's] decision as to any one subsection in order to affirm the termination of parental rights." *In re M.M.*, 106 A.3d 114, 117 (Pa. Super. 2014) (citation omitted). We thus focus our analysis on section 2511(a)(8).

To terminate parental rights under section 2511(a)(8), the petitioner must establish that: (1) the child has been removed from the care of the parent for at least twelve months, (2) that the conditions which led to the removal or placement of the child still exist, and (3) that the termination of parental rights would best serve the needs and welfare of the child. *Interest of M.E.*, 283 A.3d 820, 832 (Pa. Super. 2022) (citation omitted); *see also* 23 Pa.C.S. § 2511(a)(8). This subsection does not require an analysis of a

parent's "willingness or ability to remedy the conditions that led to the placement of the children." *M.E.*, 283 A.3d at 832. Instead, the inquiry focuses on "whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *Id.*

The orphans' court found that Father failed to remedy the conditions that led to Children's placement, which occurred approximately two-and-a-half years prior to the filing of the termination petitions and more than five years before the hearings on the petitions. Orphans' Court Opinion, 10/3/2024, at 24. Specifically, the orphans' court pointed to testimony concerning Father's "serious mental health," his refusal to follow the recommendations of his psychiatrist (including failing to take his prescribed medication), his refusal to sign ROIs to allow CYF to gain access to his treatment information, and his denial that he had a mental health disorder. *Id.* at 14-18. The orphans' court further observed that Father's failure to comply with mental health treatment resulted in his inability to maintain housing and to address the many and varied treatment needs of Children, K.P. in particular. *Id.* at 17-19, 21. Finding Father's denials to lack credibility, and crediting instead the testimony of the various mental health treatment providers, the court found that Father's continued failure to comply with treatment will result in sustained and irreversible brain damage. *Id.* at 18.

Father argues that the orphans' court abused its discretion by terminating his parental rights pursuant to section 2511(a)(8) because the conditions that led to the removal of Children—namely, his mental health concerns, substance abuse, and intimate partner violence—no longer exist. Father's Brief at 15. He contends that he had no contact with Mother up until the termination hearing, eliminating the concern of intimate partner violence between the two, and that there was no evidence at trial that Father's mental health "could not be controlled with proper medication." *Id.*

Our review of the record supports the orphans' court's findings. There is no question that Children have been removed from Father's care for more than twelve months N.T., 6/6/2024, at 72-73. Further, the conditions that led to Children's removal and continued placement continue to exist. The primary conditions that led to Children's removal were concerns about Father's mental health, intimate partner violence, and substance abuse. *Id.* at 73. Dr. Sean Weldon, Father's treating psychiatrist through UPMC Mercy Hospital's community treatment program, testified that he has been Father's treating psychiatrist since 2017. *Id.* at 33. Dr. Weldon indicated Father has been diagnosed with schizophrenia and cannabis use disorder. *Id.* at 34. As part of Father's participation in this program, he saw Dr. Weldon once a month for in-person appointments starting in 2017. *Id.* at 37. Father was prescribed

and received injections of the antipsychotic drug haloperidol[5] to treat some of the symptoms of his schizophrenia at these appointments. *Id.* at 36-37. Specifically, Dr. Weldon stated that haloperidol is intended to help patients manage symptoms like auditory or visual hallucinations, disorganized thinking, and difficulty communicating in a logical fashion. *Id.* at 37.

Dr. Weldon testified that when Father was taking his prescribed medication consistently, "he did quite well," and it was easier for Father to have a working relationship with the community treatment team while he was taking his medication. *Id.* at 38. Father was "intermittently adherent" to his medication plan, in part because he believed he did not have a legitimate mental health diagnosis and thus did not need medication. *Id.* at 35, 42. Dr. Weldon stated that when Father was not taking his medication, Father's disorganization and delusional thinking worsened. *Id.* at 40.

In February 2023, Father decided to stop receiving this medication against medical advice. *Id.* at 35. Father also expressed that he no longer wished to see Dr. Weldon, because he did not believe that he needed medication or had a valid psychiatric diagnosis. *Id.* at 41. Dr. Weldon testified that he has been able to meet with Father a few times since he discontinued his medication, and that Father had become "sort of irrational and difficult to maintain on point and express logical, reasonable thinking or

_____

[5] Haloperidol is often referred to by its brand name, Haldol.

ideas." *Id.* Further, he stated that Father expressed "persecutory delusions" about the community treatment team and its motives. *Id.* Dr. Weldon also expressed concern that Father is no longer participating actively in the community treatment program or receiving his prescribed medication. *Id.* at 42. He stated that in his professional opinion, Father's risk of permanent loss of degrees of cognitive function increases the longer that Father's schizophrenia goes untreated. *Id.* at 43.

Additionally, as the orphans' court found, Father's decision to reduce his participation in the community treatment program has other consequences, particularly regarding his ability to obtain stable housing. Todd Cobourne ("Cobourne"), a registered nurse who is part of the community treatment program, testified at trial about the non-medical assistance that the program offers, including rental assistance. *Id.* at 55. The treatment team was able to step in as Father's payee and assist him in paying back approximately $2,000 in delinquent rent that he owed to his landlord. *Id.* at 56. Furthermore, as a participant in the treatment program, Father qualifies for spectrum housing, a county program that covers a significant portion of participants' rent. *Id.* Cobourne testified to Father's plans to discontinue participation in the treatment program, which would result in the loss of access to the housing assistance it provides. *Id.* at 57.

Father's failure to comply with his mental health treatment has also raised serious concerns about his ability to parent Children and to address

their needs. N.T., 7/23/2024, at 28-29. Child and forensic psychologist Dr. Patricia Pepe, who completed an evaluation with Father, noted that Father's lack of continuity and consistency in his use of medication for mental health treatment poses a significant barrier to his ability to parent Children. *Id.* at 28. CYF caseworker Denise Washington ("Washington") testified to similar concerns, specifically that Father "may not have the patience or the skill set" to address K.P.'s aggressive behavior due to his lack of mental health treatment. N.T., 6/6/2024, at 102, 108. She noted that there were marked differences in Father's interactions with Children when he "was not actively taking his medication," particularly related to his ability to understand K.P.'s behavior and effectively address it. *Id.* at 108. Washington concluded that Father's "lack of mental health treatment has been a continuous barrier in terms of his goals and interactions with the children." *Id.*

CYF also presented evidence demonstrating Father's lack of cooperation with its repeated requests for updated ROIs, through which it could obtain updated documentation related to Father's mental health treatment. *Id*. at 101. According to Washington, Father refused to sign the ROIs because he did not believe that he had a mental health disorder. *Id.* Father continued to deny that he had any mental health issues or need for mental health treatment during his testimony. N.T., 7/23/2024, at 54.

Dr. Pepe testified that during her evaluation with Father, he denied that he had mental health issues or diagnoses numerous times. *Id.* at 21. He also

denied ever being prescribed medication at UPMC Mercy, though he confirmed his involvement in the community treatment program. *Id.* Dr. Pepe expressed concern about Father's emotional reactivity during the evaluation, as well as his indications of persecutory thinking and "concerning speech patterns that would be reflective of psychotic functioning." *Id.* at 21-22. Further, she expressed concern that Father denied any responsibility for domestic violence committed against Mother, as she believes that K.P.'s behavioral issues may be related to the impact of witnessing domestic violence in the home. *Id.* at 28.

Father testified that he did not have mental health problems. *Id.* at 70. In response to a follow-up question about his participation, Father indicated that his involvement in UPMC Mercy's community treatment program was to participate in recreational activities. *Id.* at 71; *see also* Orphans' Court Opinion, 10/3/2024, at 18 (noting the court placed very little weight on Father's testimony).

The record clearly establishes that the concerns regarding Father's mental health that led to the removal and continued placement of Children continue to exist. Father discontinued his medication against medical advice and is unwilling to engage in mental health treatment because he does not believe he has a mental health disorder. This is creating additional barriers to reunification including, inter alia, his ability to maintain stable housing. Though Father reasonably asserts that the condition of intimate partner

violence present at the time of Children's removal no longer exists because he is no longer in contact with Mother, he has not provided any evidence to establish that the condition related to his mental health no longer exists. Thus, the record supports the orphans' court's finding that one of the central concerns that resulted in Children's removal from Father's care continues to exist, and the court did not abuse its discretion in finding clear and convincing evidence to satisfy termination under the first two prongs of section 2511(a)(8).

We next consider whether the record supports the orphans' court's conclusion that CYF proved by clear and convincing evidence that termination best serves Children's needs and welfare pursuant to the third prong of section 2511(a)(8) and section 2511(b).[6] Father contends that CYF failed to prove by clear and convincing evidence that termination of his parental rights would best serve the needs and welfare of Children. Father's Brief at 15. Specifically, he argues that the record demonstrates that Children have a meaningful relationship with him "which should be preserved for the benefit of the Children." *Id*.

---

[6] Though they are separately enumerated, this Court has interpreted the needs and welfare analyses required under subsections (a)(8) and (b) to utilize the same legal standards and to be based upon the same evidence. *See, e.g., Matter of Adoption of M.A.B.*, 166 A.3d 434, 448 (Pa. Super. 2017) (combining discussion of children's needs and welfare under subsection (a)(8) and subsection (b) is permissible because "the third element of [s]ection 2511(a)(8) requires that the [o]rphans' [c]ourt conduct an analysis similar to that required under [s]ection 2511(b)").

Section 2511(b) provides:

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

Our analysis focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. **T.S.M.**, 71 A.3d at 267. "[T]he determination of the child's needs and welfare requires consideration of the emotional bonds between the parent and child. The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond." **Id.** (quotation marks omitted). It is not enough that there exists a bond between parent and child to avoid termination. **See Interest of K.T.**, 296 A.3d 1085, 1109 (Pa. 2023). Rather, the trial court must determine whether the bond is "necessary and beneficial" to the child, such that "maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." **Id.** at 1105-06. Focusing upon the "child's development, and mental and emotional health," the trial court should assess whether severing the bond "is the kind of loss that would predictably cause extreme emotional consequences or significant, irreparable harm" to the child. **Id.** at 1110-11.

- 14 -

Additionally, "the parental bond is but one part of the overall subsection (b) analysis[.]" *Id.* at 1113. The needs and welfare analysis must also include the consideration of factors such as: "the child's need for permanency and length of time in foster care …; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." *Id.* (citations omitted). "These factors and others properly guide the court's analysis of the child's welfare and all [their] developmental, physical, and emotional needs." *Id.* Importantly, "[orphans'] courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs." *Id.*

The orphans' court found that CYF established by clear and convincing evidence that though an emotional bond between Father and Children exists, it is not necessary and beneficial to the children. Orphans' Court Opinion, 10/3/2024, at 31. It further held that the bond between Father and Children is "outweighed by Father's inability to remedy the causation of placement, and by the children's need for permanence and stability." *Id.* The court held that Foster Parents had provided for Children's needs and welfare, and that Children had transferred their trust and emotional dependency to Foster Parents, thus creating a strong bond with them. *Id.* at 31-32.

The record supports the orphans' court's determination. Washington testified that Children's needs and welfare are best served by terminating both parents' parental rights. N.T., 6/6/2024, at 116-17. Specifically, Washington pointed to CYF's concerns that Father could not appropriately address Children's developmental and emotional needs, especially K.P.'s behavioral challenges. *Id.* at 102. As noted above, she observed that it was particularly difficult for Father to address K.P.'s behavioral issues when he was not actively taking his medication, and that his lack of mental health treatment has been a continuous barrier to his ability to care for Children. *Id.* at 108. Washington additionally testified that Father has not participated in any of Children's medical or educational appointments despite receiving notice of the appointments when they were scheduled. *Id.* at 105.

Washington acknowledged the difficulty that Foster Parents had during Children's first placement with them, but noted that Foster Parents had made clear progress in their ability to handle K.P.'s behavior. *Id.* at 109-10, 114. During her home visits, Washington noted that Children seemed relaxed and acted like a family unit with Foster Parents. *Id.* at 110-11. She concluded that Foster Parents were appropriately meeting Children's educational, psychological, and developmental needs. *Id.* at 116. Washington additionally observed that Foster Parents have taken Children to the necessary appointments and advocated for their medical and mental health needs. *Id.* at 114.

Bruce Goldhagen ("Goldhagen"), a visit coach for JusticeWorks Youth Care assigned to work with Father, provided additional testimony regarding Father's capacity to address Children's developmental and emotional needs. Goldhagen testified that though the visits between Father and Children went well in the beginning, they became more difficult after visits moved from Father's residence to Auberle. *Id.* at 169-70. He stated that Father became angry that visits could no longer occur at his residence and began to have difficulty dealing with both Children's behavior. *Id.* at 170. Specifically, Goldhagen stated that Father's frustration regarding visitation in general began to impact his ability to meet Children's needs during visits, and that it became impossible for Goldhagen to redirect Father out of this frustration and anger. *Id.* at 170-71; *see also id.* at 170 (noting JusticeWorks discharged Father from the coached visitation program in April 2024 because of these challenges).

Dr. Pepe conducted individual evaluations with Father, K.P., and M.P., as well as an interactional evaluation with Children and Father. N.T., 7/23/2024, at 9. Dr. Pepe diagnosed both K.P. and M.P. with post-traumatic stress disorder, upbringing away from parents, child affected by parental relationship distress, and a rule-out for child neglect. *Id.* at 15-16. She recommended trauma therapy for both, along with an "in-home therapeutic program to assist with [K.P.'s] explosive behaviors." *Id.* Dr. Pepe also testified regarding her observations during the interactional evaluation she

- 17 -

completed with Father and Children, noting that Children were clearly happy to see Father and that Father was affectionate and playful with them. *Id.* at 27.

Dr. Pepe also completed an interactional evaluation with Foster Parents and Children, during which she observed that K.P. was very responsive to Foster Parents' efforts to address her behavior. *Id.* at 29-30. She further noted that both Children looked to Foster Parents for help and sought physical affection from Foster Parents. *Id.* at 29. Dr. Pepe additionally observed that Children had formed a positive attachment to Foster Parents, and that Foster Parents have expressed a commitment to caring for Children. *Id.* at 30. She concluded by recommending Children's adoption by Foster Parents, noting the importance of developing and maintaining stability for Children's ongoing treatment and growth. *Id.* at 31.

Additionally, Auberle caseworker Cara Cornelius testified regarding Children's adjustment in Foster Parents' home, stating, "[Children] seem very happy and comfortable with the foster family," and that Foster Parents appeared to be meeting Children's educational, medical, and general needs. *Id.* at 185-86. CYF caseworker Renee Taddy, who took over Children's case from Washington in March 2024,[7] also observed that Foster Parents "follow the recommendations of [Children's primary care providers] or providers that

_____

[7] Before becoming the direct services caseworker for Children's case, Taddy was their permanency caseworker.

have been able to complete evaluations." ***Id.*** at 208. She added that Foster Parents "are very active" in Children's behavioral health care. ***Id.***

Father testified to his ability to care for Children and provide for their needs on his own. ***Id.*** at 52, 65. When the court asked Father whether he knew what Children's diagnoses were, he stated: "When they are with me, they are fine, like, because like just period. That's my dad type stuff." ***Id.*** at 73.

Based on the record before us, we conclude that the orphans' court did not abuse its discretion in its determination that terminating Father's parental rights best served the needs and welfare of Children under section (a)(8) and (b). Although the record reflects that Father and Children share an emotional bond and Father loves Children, this bond is not necessary and beneficial to Children, in large part because Father is not able to provide the level of care that Children need as a result of his own mental health challenges. ***See In re Z.P.***, 994 A.2d 1108, 1121 (Pa. Super. 2010); ***see also M.E.***, 283 A.3d at 839 (noting that orphans' court does not have to consider the bond between parent and child "over all other needs and welfare considerations"). Indeed, Father does not understand Children's needs, and his discontinuation of his own mental health treatment and his expressions of persecutory thinking regarding healthcare providers demonstrate numerous barriers to his ability to appropriately provide for Children's needs and welfare, as well as the potential to impede Children's further growth and development. ***See In re***

**P.Z.**, 113 A.3d 840, 852 (Pa. 2015) (finding termination of parental rights supported under 2511(a)(8) and (b) where child was familiar with parent, but parent did not have a history of engaging in a caregiving relationship with child or taking responsibility for child over an extended period). Further, Children have bonded with Foster Parents and that Foster Parents are able to provide for Children's developmental, physical, and emotional needs. **See K.T.**, 286 A.3d at 1114. The court therefore appropriately concluded that termination of Father's parental rights best serves Children's needs and welfare.

As we have found that the orphans' court's determination pursuant to section 2511(a)(8) and (b) has ample support in the record, we must affirm the orders terminating Father's parental rights to Children. **See Matter of L.C.J.W.**, 411 A.3d at 48 (noting that "absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand").

Orders affirmed.

Judge Kunselman joins this memorandum.

Judge Sullivan files a dissenting memorandum.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: <u>4/25/2025</u>