J-A29010-23

2024 PA Super 32

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: L.C.J.W., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.M.G., MOTHER | : : : | |
| | : | No. 688 WDA 2023 |

Appeal from the Order Entered June 1, 2023
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
23 in Adoption

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: L.R.W., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.M.G., MOTHER | : : : | |
| | : | No. 689 WDA 2023 |

Appeal from the Order Entered June 1, 2023
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
23A in Adoption 2023

BEFORE: BOWES, J., KUNSELMAN, J., and MURRAY, J.

OPINION BY BOWES, J.:                    **FILED: February 22, 2024**

A.M.G. ("Mother") appeals from the orders that involuntarily terminated her parental rights to her children L.C.J.W. and L.R.W., born in May 2016 and September 2021, respectively.[1]  We affirm.

The underlying facts of these cases are as follows.  Erie County's Office of Children and Youth ("OCY") first became involved with the family in May 2016, when L.C.J.W. was born drug-exposed and placed in a neonatal

_____

[1] The parental rights of the children's father ("Father") were terminated on May 26, 2023, and he did not appeal.

intensive care unit. Mother was evaluated for substance abuse and other mental health concerns, underwent a treatment plan, and resumed care of him the following year. OCY received another referral due to substance abuse fifteen months later, with services again provided without court involvement until the case was closed in September 2020.

Thirteen months later, newborn L.R.W. was transported to Children's Hospital of Pittsburgh on October 7, 2021, after nearly suffocating when Mother placed him on a mattress in her bedroom and left him unattended. OCY obtained an emergency order to remove him from his parents' care when they failed to take him to follow-up appointments necessary to monitor for liver failure. During the October 29, 2021 removal, OCY observed week-old burn marks on L.R.W.'s hands and feet. Mother reported that a space heater had fallen and landed on him, and no medical attention was sought.[2] On November 23, 2021, the court adjudicated L.R.W. dependent and set a goal of reunification. At the parents' request, L.R.W. was placed with Mr. and Mrs. Burroughs, who were cousins of Mother. The court established a permanency plan that required Mother to, *inter alia*, continue drug and alcohol treatment, undergo a mental health assessment, submit to urinalysis testing, obtain and maintain income and safe and stable housing, participate in all

_____

[2] Ultimately, both Mother and Father pled guilty to endangering the welfare of a child in connection with this incident. **See** N.T. Hearing, 5/11/23, at 10.

recommended medical appointments and follow-ups for L.R.W., and remain in weekly communication with OCY.

At the initial permanency review hearing, the court found that Mother had minimally complied with the treatment plan. It changed the permanency goal to return to parent concurrent with adoption and entered a similar treatment plan regarding compliance with drug and alcohol and mental health treatment, participating in L.R.W.'s medical care, and maintaining at least weekly contact with OCY.

Shortly before that hearing, OCY filed a dependency petition regarding L.C.J.W. after learning that Mother had accidently sent a text to the Burroughs offering to trade suboxone for cocaine. L.C.J.W. was placed in protective care on February 23, 2022, and adjudicated dependent on March 8, 2022, based upon frequent tardiness and absences from virtual school classes and speech services, as well as Mother's continuing substance abuse, refusal to submit to screenings or to release the results to OCY, and failure to maintain communication with OCY. Similar treatment and permanency plans were established, as well as directions to participate in an agency-approve domestic violence program and in mental health services. The initial permanent placement goal was return to parent concurrent with adoption. L.C.J.W. joined L.R.W. in kinship placement with the Burroughs.

On May 25, 2022, the court held the initial permanency review of L.C.J.W. and second review for L.R.W. The court found Mother to be

moderately compliant, maintained the same concurrent permanent placement goals, and reiterated the aforementioned goals for Mother. A permanency review hearing in November 2022 yielded similar findings, plans, and goals. Mother and Father did progress to unsupervised weekend visits with the children, at which OCY aides would appear "for pop-ins."[3]  N.T. Hearing, 5/11/23, at 15.

On February 4, 2023, the Burroughs rushed L.R.W. to the hospital with second-degree burns on his feet and a bruise on his cheek that he sustained while the children were on a weekend visit with Mother and Father. The court continued the scheduled review hearing and entered an order precluding either parent from having any form of contact with the children. On February 26, 2023, Mother was treated at St. Vincent's Medical Center for an intentional overdose and spent the following week in a mental health ward in Clarion. At the subsequent permanency review hearing on March 8, 2023, the court granted the request of the children's guardian *ad litem* ("GAL") to change their permanency goal to adoption.

OCY filed its petitions to terminate Mother's parental rights as to L.C.J.W. and L.R.W. on March 2, 2023. **See** Petition for Involuntary

---

[3] At more than one such pop-in, six-year-old L.C.J.W. attempted to conceal, and then lied about, playing the notoriously violent video game Grand Theft Auto, an activity that both parents and L.C.J.W. knew was to have been ceased because the child had begun acting out aggressive behaviors at school and at home. **See** N.T. Hearing, 5/11/23, at 14-15.

Termination (L.C.J.W.), 3/2/23, at 18; Petition for Involuntary Termination (L.R.W.), 3/2/23, at 17. The court held a hearing on the petitions on May 11, 2023.[4] The court heard testimony from Rachel Lynch, the initial OCY caseworker; Rachel Campbell, the OCY caseworker assigned when the children's goals were changed to adoption; Karin Wickwire, a pediatric acute care nurse practitioner; Dr. Adeliade Eichman, a pediatrician in the child advocacy division of UPMC Children's Hospital of Pittsburgh; and Mother.

Ms. Lynch testified that Mother's lack of follow-through with services, the ongoing concerns with her substance abuse and mental health, and her continued refusal to acknowledge "the significance of the child welfare history [and] the injuries being sustained" resulted in her failure to remedy the conditions that led to the placement of the children. *See* N.T. Hearing, 5/11/23, at 22. Ms. Lynch acknowledged that Mother had made improvements in her ability to provide discipline and to have an appropriate level of attention to the children, but maintained that she had not fully remedied the concerns. *Id*. at 46, 49-50. For example, on April 23, 2023, between the filing of the termination petitions and the hearing, police became involved when Mother "was suicidal and had some paranoid behaviors." *Id*. at 22-23. Further, Mother made excuses for the incidents that led to the

---

[4] Both children were represented by the same GAL. Before the hearing, the orphans' court granted a motion filed by the GAL requesting the appointment of counsel for L.C.J.W. because she had determined that his legal interests contradicted his best interests. *See In re L.B.M.*, 161 A.3d 172 (Pa. 2017).

- 5 -

children's placement rather than acknowledging her responsibility, such as blaming L.C.J.W. for knocking the space heater onto L.R.W. instead of taking accountability for having the heater on a counter above his swing. *Id*. at 24-25. Additionally, Mother did not appear for all scheduled drug screenings and had tested positive for methamphetamine at the hospital during her most recent relapse. *Id*. at 56.

Ms. Lynch indicated that Mr. and Mrs. Burroughs had been a constant in the children's lives since L.R.W.'s placement with them when he was an infant. Although L.C.J.W. had a relationship with Mother and expressed excitement for visits, he engaged appropriately with Mr. and Mrs. Burroughs, respected their authority, and sought comfort from them when distressed. *Id*. at 29.

Ms. Campbell offered more information about the children's placement in the Burroughs home, a two-parent household with no other children present. *Id*. at 86. Mr. and Mrs. Burroughs had been meeting all of the children's needs, such as taking L.R.W. to speech therapy and follow-up visits for his most recent burn injuries, and L.C.J.W. to therapy for post-traumatic stress resulting from his experiences in his parents' home. *Id*. at 87-88. Both children have positive relationships with their caregivers, with L.C.J.W. being particularly close to Mr. Burroughs. *Id*. at 86. Ms. Campbell testified that she would be concerned if the children were removed from the Burroughs's home because it was the only one that L.R.W. has ever known, and L.C.J.W. feels

safe there, having indicated that he would like to stay in the Burroughs home if he does not return to Mother. *Id*. at 89-90.

Conversely, Ms. Campbell indicated that the children would not be negatively impacted if Mother's rights were terminated. L.C.J.W. in particular had been doing very well in the two months of no contact with his parents but had been triggered into reliving his trauma when he received a gift of a teddy bear that included an audio recording of Mother and Father. *Id*. at 90-94. Overall, Ms. Campbell opined that both children's needs for permanency, stability, and safety would best be served by terminating Mother's parental rights. *Id*. at 94.

Nurse Practitioner Wickwire confirmed the multiple serious injuries L.R.W. sustained while in the care of Mother and Father, expressed concern "for the general safety of the caregiving situation" with them, and indicated trepidation at the thought of placing the children back into their care. *Id*. at 70. Similarly, Dr. Eichman testified to a reasonable degree of medical certainty that L.R.W.'s preventable injuries resulted from his parents lacking "just some basic understanding of [a] child's needs and well-being" such that she would be concerned with any child being in their care at this point. *Id*. at 116-17.

While Father chose not to testify at the hearing, Mother elected to do so. She professed her lack of responsibility for causing L.R.W.'s most recent burn injuries and explained that she did not travel to see him during the

resultant hospital admission because she believed that she was not permitted to see him. *Id*. at 99-100. Mother opined that her rendering of aid to weeks-old L.R.W. when he was suffocating showed her ability to "assess the situation calmly and handle it obviously successfully because, I mean, he was breathing after I performed CPR." *Id*. at 101. She rationalized missed appointments for services by indicating that she had to share a phone with Father and suffered the loss of her brother. *Id*. at 102. Mother expressed how much she missed L.C.J.W. and her knowledge that he reciprocated the feelings. *Id*. at 104. She conceded that she was "not as close with [L.R.W.]," but suggested that she had been able to connect with him during visits. *Id*.

Mother disputed that she had only made moderate progress in pursuing reunification, asserting that she "busted [her] butt to do every single thing that OCY asked of [her] for a very long time[.]" *Id*. at 105. She regretted her suicide attempt, calling it a "stupid decision" made "because [she] didn't want to live without [her] kids," but she had resumed "getting [her] mental health situated" and "would definitely appreciate the chance to, you know, be able to still be their mom[.]" *Id*. Mother said she "would do anything basically to do that" and believed that she "did show definite growth throughout this progress, and [was] way better off than [she] was when [she] first started." *Id*. at 105-06.

At the conclusion of the testimony, the GAL indicated that, since L.R.W. was non-verbal at his young age, his legal interests did not conflict with his

best interests. Her position was that the best interests of both children would be served by terminating Mother's parental rights and giving them the permanency of adoption, which would provide them with the safe and stable environment that they lacked with Mother. *Id*. at 127. L.C.J.W.'s legal counsel informed the court that she had spoken with her client at length, and it is his preference to return to the care of his parents. *Id*. at 126.

The orphans' court took the matter under advisement before granting the petitions by orders of May 26, 2023, and Mother filed timely notices of appeal, which this Court consolidated *sua sponte*. Both Mother and the orphans' court complied with their respective Pa.R.A.P. 1925(a) duties. Mother presents the following questions for our consideration:

    A.    Whether the orphans' court committed an abuse of discretion and/or error of law when it determined that [OCY] established, by clear and convincing evidence, the grounds for termination of parental rights pursuant to 23 Pa.C.S. [§] 2511(a)(1)?

    B.    Whether the orphans' court committed an abuse of discretion and/or error of law when it determined that [OCY] established, by clear and convincing evidence, the grounds for termination of parental rights pursuant to 23 Pa.C.S. [§] 2511(a)(2)?

    C.    Whether the orphans' court committed an abuse of discretion and/or error of law when it determined that [OCY] established, by clear and convincing evidence, the grounds for termination of parental rights pursuant to 23 Pa.C.S. [§] 2511(a)(5)?

    D.    Whether the orphans' court committed an abuse of discretion and/or error of law when it determined that [OCY] established, by clear and convincing evidence, the grounds

for termination of parental rights pursuant to 23 Pa.C.S. [§] 2511(a)(8)?

E. Whether the orphans' court committed an abuse of discretion and/or error of law when it determined that [OCY] established, by clear and convincing evidence, the grounds for termination of parental rights pursuant to 23 Pa.C.S. [§] 2511(b)?

Mother's brief at 4 (apostrophes added).[5]

We begin with an examination of the applicable legal principles.

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

_____

[5] L.C.J.W., through his legal counsel, filed a brief relying in large part upon Mother's brief. The GAL submitted a letter indicating that she would rely upon OCY's brief. OCY, in turn, submitted a letter stating that it relied upon the analysis offered in the orphans' court opinion.

*In re Adoption of C.M.*, 255 A.3d 343, 358–59 (Pa. 2021) (cleaned up).  It is the province of the orphans' court to assess credibility and resolve any conflicts in the evidence, and in doing so it "is free to believe all, part, or none of the evidence presented[.]"  *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted).  Hence, "if competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result."  *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.  As we have explained:

> Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [§] 2511(a).  Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [§] 2511(b):  determination of the needs and welfare of the child under the standard of best interests of the child.  One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re Adoption of B.G.S.*, 245 A.3d 700, 705 (Pa.Super. 2021) (cleaned up).  We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."  *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (cleaned up).

- 11 -

Here, the orphans' court determined that OCY established the elements of subsections (a)(1), (2), (5), and (8) as well as subsection (b). However, it is well-settled that "[w]e need only agree with the court as to any one subsection of [§] 2511(a), in addition to [§] 2511(b), to affirm." ***In re Adoption of B.G.S.***, 245 A.3d at 705. Accordingly, we examine the propriety of the court's ruling under § 2511(a)(8) and (b). Those subsections provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> . . . .
>
>> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
>> . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

To meet its § 2511(a)(8) burden, OCY was required to establish three elements: "(1) that the child has been removed from the care of the parent for at least twelve months; (2) that the conditions which led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child." *Int. of M.E.*, 283 A.3d 820, 832 (Pa.Super. 2022) (citation omitted). This subsection "does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children." *Id*. (citation omitted). Rather, "the relevant inquiry regarding the second prong of § 2511(a)(8) is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *Id*. (cleaned up).

In this case, there is no dispute that both L.C.J.W. and L.R.W. had been removed from Mother's care for at least twelve months. On the issues of Mother's failure to remedy the conditions that led to the placement and whether termination would best serve the children's needs and welfare, the orphans' court found the evidence clear and convincing in favor of termination. The court first explained:

> [Mother] failed to adequately address any of the issues that led to her children's removal. [OCY] put together a comprehensive plan to put [Mother] in a position to have the children returned to her and be raised in a safe environment. Parenting, drug and alcohol treatment and mental health therapy were all components to help [Mother] put her life in order. She sporadically attended programs but eventually stopped her cooperation. As late as February 26, 2023, [M]other's dual drug

- 13 -

and alcohol and mental health issues came to the fore. On February 26, 2023, [Mother] went to St. Vincent's Medical Center stating that she had overdosed. [She] admitted to intentionally taking all the medication she had in her possession at the Review Hearing on March 8, 2023. [Mother] was placed in a mental health ward at Clarion Hospital for a week after that hearing. This incident underscores that despite all the programs designed to help [M]other since 2016, she has failed to internalize any of the treatment she received, if and when she decided to attend the programs.

Orphans' Court Opinion, 7/25/23, at 27. The court placed "little or no credibility" in Mother's testimony, opining that it "corroborated [OCY]'s position that she had excuses and explanations for her behavior, but accepted no responsibility either for her actions or omissions." *Id*. Mother's continuing failure to "demonstrate any acceptance of her responsibility to be able to safely parent [the] children" supported the testimony of Dr. Eichman and Nurse Practitioner Wickwire that Mother's household was unsafe for any child to reside there. *Id*. at 26.

Concerning the needs and welfare component of § 2511(a)(8), the orphans' court observed:

L.C.J.W. was particularly traumatized by [M]other's failure to provide the most essential element of parenting — protection of children. As noted, he has been diagnosed with PTSD stemming from the incidents with his little brother while under the care of [M]other and [F]ather. He has stated he doesn't feel unsafe in their care but has expressed concerns for L.R.W.'s safety. Obviously[,] what occurred while the children were in their parents' care has deeply affected L.C.J.W. These traumas have led to problematic behaviors by L.C.J.W. which are being addressed through therapy. These behaviors have reduced since visitation with the parents was stopped.

. . . .

- 14 -

> . . . The Burroughs are the only parents L.R.W. has known. All his needs are being addressed by the foster parents. He has healed from his injuries and is doing well. L.C.J.W. has done well in the Burroughs' home as well. The trauma he has suffered is being addressed through trauma therapy with which the Burroughs are involved. Although still having behavioral issues at school, L.C.J.W. has stopped his aggressive and threatening behavior towards his peers. He has a good relationship with the foster parents[,] especially the dad, respects their authority, and seeks comfort and care from them when the situation calls for such. The needs and welfare of both boys would be served by termination of parental rights, and the criteria supporting termination under [§] 2511(a)(8) . . . have been met.

*Id*. at 27, 29.

Mother challenges the court's § 2511(a)(8) analysis first by contending that the ruling was improper because "[Mother] made many attempts and progress on addressing the conditions that led to removal." Mother's brief at 22. She highlights the lack of positive drug tests between March 2022 and February 2023,[6] when she had what she described as "an unfortunate overdose incident." *Id*. at 20. Mother notes that the evidence demonstrates "a willingness to enter rehab and work her way through the ups and downs of addressing substance abuse." *Id*. Thus, she "believes that [OCY] lacks clear and convincing evidence to demonstrate that the conditions will not be rectified in a reasonable amount of time, as she had made acceptable progress up to the point of the burn incident." *Id*. at 22-23. Concerning § 2511(a)(8)'s needs and welfare component, Mother merely observes that "[n]o testimony

---

[6] Some of the tests during this time frame we deemed to be positive because Mother failed to appear to provide a sample.

was presented leading to concerns for the educational needs of L.C.J.W. not being sufficiently met." *Id*. at 20.

Mother's arguments fail to convince us that the ruling of the orphans' court pursuant to § 2511(a)(8) lacks the support of competent evidence. First, as we noted above, the fact that L.C.J.W.'s educational needs were not being met when he was in Mother's care, as he was absent or tardy from school, was among the reasons he was removed from her care for the second time. In any event, the court's opinion evinces that it considered L.C.J.W.'s overall needs, with a focus upon the emotional and behavioral problems induced by the trauma of being under Mother's care. The court reasonably concluded that OCY established that the needs and welfare of the children would be best served, for purposes of subsection (a)(8), by granting the termination petition.

Second, Mother's noted willingness to continue progressing toward being able to parent L.C.J.W. and L.R.W. in a reasonable amount of time has no bearing on a subsection (a)(8) analysis. Rather, the issue is whether, after a full year of services, she had remedied the conditions such that she was presently able to resume care and custody of her children. The evidence that Mother continued to struggle with addiction and mental health and was unable to provide a safe environment for the children fully supports the conclusion that she was not.

This Court has recognized that subsection (a)(8) may appear harsh when a parent has made progress. However, we have observed that,

> by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

***Int. of M.E.***, 283 A.3d at 832 (cleaned up).

Accordingly, we conclude that the orphans' court committed no error of law or abuse of discretion in finding that OCY proved the elements of § 2511(a)(8) by clear and convincing evidence.

Turning to § 2511(b), we reiterate the governing principles:

[C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.

Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The court must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster

- 17 -

parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Int. of K.T.*, 296 A.3d 1085, 1105–06 (Pa. 2023) (cleaned up).

This Court has stressed that "the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010) (cleaned up).

It is up to the orphans' court to consider the totality of the circumstances when performing a needs and welfare analysis. Nothing in our case law dictates that the bond between a child and parent must predominate over all other needs and welfare considerations. Instead, after ascertaining the nature and status of the bond and effect on the child of severing it, the orphans' court must weigh any pain from breaking the bond against other considerations as to what result serves the child's needs and welfare.

*Int. of M.E.*, 283 A.3d at 839 (cleaned up). We have held that it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents," and that this Court will not disturb such an assessment when the court's "factual findings are supported by the record." *Id*. (cleaned up). Furthermore, in weighing the § 2511(b) bond considerations, "courts must keep the ticking clock of childhood ever in mind." *In re T.S.M.*, 71 A.3d 251, 269 (Pa. 2013).

Mother argues that "she has adequately addressed the developmental, physical, and emotional needs of the children as well as provided for their welfare." Mother's brief at 24. She cites her own testimony about "providing

for the daily needs of her children, especially L.C.J.W.," highlighting the following:

> She stated that she would ride bikes, read books, sing songs with L.C.J.W. She bathed him, provided for his schooling needs during home schooling for COVID-19, provided discipline and attempted to work on discipline techniques such as "time-outs." She believed that he responded well to her and was progressing over time with learning better discipline. This progress was substantiated by the Court Summary notes of November 30, 2022 in which it was noted that the [Mother] had shown an improvement in her ability to follow through with time-outs and set achievable goals such as completing homework with [L.C.J.W.] before he can have any playtime.

*Id*. at 24-25 (citations omitted).

Mother also points to her testimony that "[she] and her sons have a lot of love and affection" and a bond that was confirmed by the OCY caseworkers. *Id*. at 25. Mother asserts that the bond analysis must be different for L.C.J.W. than from his younger brother, observing the fact that he is older and had not been physically impacted by the "safety issues" that resulted in L.R.W.'s multiple injuries. *Id*. at 25-26. In sum, while Mother contends that she had a beneficial bond with both children, she is particularly adamant that severing her bond with seven-year-old L.C.J.W. was not in his best interests.[7]

The orphans' court offered the following explanation of its § 2511(b) analysis:

_____

[7] L.C.J.W., through his legal counsel, joins in Mother's argument on this issue, stressing that returning to Mother is his preference. *See* L.C.J.W's brief at 2-5.

When examining the emotional bond between [M]other and [the] children, the evidence demonstrates that such a bond is tenuous at best. L.C.J.W.'s destructive behaviors at school minimized once visits with [M]other stopped. The only parents L.R.W. has known are the Burroughs. [Ms.] Campbell noted some desire by L.C.J.W. to return to his parents. However, as noted, his behaviors improved once visits stopped. His trauma therapist thought contact with the parents was not positive. This was as a result of L.C.J.W. getting emotional after receiving the audio message from his parents in the Build-A-Bear, and the therapist got the recording removed. [Ms.] Campbell believes with therapy, L.C.J.W. will overcome any issue with termination of his contact with his parents. This is a case involving physical abuse and considering the safety needs of the children is critical. [Mother] has failed to remedy the conditions of lack of parenting, substance abuse and mental health that led to the removal and placement of her children. Dr. Eichman, Nurse Practitioner Wickwire, as well as [Ms.] Lynch, were of the opinion any child would be at risk with the parents in this case. L.R.W. and L.C.J.W. have developed a bond with the Burroughs and all their needs are being met. The Burroughs provide love, comfort, security and stability for both boys.

The evidence demonstrated that severing contact with [M]other has not had any detrimental effect on the children. Not permitting these children to have to face the continued trauma and instability they have been through in their short lives is of paramount concern to this court. There would be no detrimental effect on either L.C.J.W. or L.R.W. by the termination of the parental relationship with [M]other.

Orphans' Court Opinion, 7/25/23, at 30-31 (cleaned up).

From our examination of the record, we again discern that the court's ruling is supported by competent evidence and does not result from an abuse of discretion or error of law. The orphans' court plainly considered the totality of the circumstances of this case, as well as the developmental, physical and emotional needs and welfare of both children and reasonably concluded that their interests would be best served by terminating Mother's parental rights

- 20 -

and allowing them to be adopted by Mr. and Mrs. Burroughs. As for L.R.W., the court aptly cited the fact that he had never had a parent-child relationship with Mother, as he had last been in her care for more than mere visits when he was a newborn. The court acknowledged L.C.J.W.'s bond with Mother but found his need for safety and stability outweighed any benefit that bond provided him. This finding is supported by the testimony concerning how well L.C.J.W. did during the months when all contact with Mother was severed, the negative effects that were triggered when Mother took it upon herself to contact him via the audio recording in the teddy bear gift, and the ability of continuing therapy to resolve any issues he may experience in the future. The certified record thus supports the orphans' court's determination that, overall, both children's developmental, physical, and emotional needs will be best served by terminating Mother's parental rights.

The severance of ties between a parent and child who love each other is always difficult. However, a court cannot "toll the well-being and permanency" of a child indefinitely in the hope that a parent "will summon the ability to handle the responsibilities of parenting." *In re C.L.G.*, 956 A.2d 999, 1007 (Pa.Super. 2008) (*en banc*) (citation omitted). Despite her obviously genuine love for her children, Mother's struggles with addiction and her mental health have rendered her incapable of providing for their needs, particularly their safety. Freed to be adopted, L.C.J.W. and L.R.W. will

- 21 -

experience the safety, security, permanence, and support that were previously lacking, as well as the love and affection of their adoptive parents.

For these reasons, we affirm the orders of the orphans' court terminating Mother's parental rights as to L.C.J.W. and L.R.W.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 02/22/2024