J-S28002-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.A.M., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 458 MDA 2025 |

Appeal from the Decree Entered March 11, 2025
In the Court of Common Pleas of Huntingdon County Orphans' Court at
No(s):  CP-31-OC-0024-2024

BEFORE:  BOWES, J., OLSON, J., and KING, J.

MEMORANDUM BY BOWES, J.:          **FILED: AUGUST 25, 2025**

A.M. ("Father") appeals from the decree terminating his parental rights as to his daughter, J.A.M., born in April 2018.[1]  We affirm.

Huntingdon County Children & Youth Services ("CYS") first became involved in J.A.M.'s life on August 3, 2023, following a report that Mother was smoking methamphetamine in the home.  At that time, Father was incarcerated, and Mother was the sole caretaker for J.A.M. and J.A.M.'s then-sixteen-year-old half-sister, D.G.  The court granted CYS's request for an emergency protective custody order.  Mother attempted to take J.A.M. and D.G. into hiding following the initiation of CYS's investigation, but the

_____

[1] The orphans' court earlier terminated the parental rights of J.A.M.'s mother, B.A.G. ("Mother").  Although Mother did not attend the termination hearing, she subsequently challenged the decree in a motion for reconsideration. Nonetheless, she has neither appealed on her own nor participated in Father's appeal.

Pennsylvania State Police extricated J.A.M. from Mother's custody. CYS then placed J.A.M. with L.T. ("Foster Mother").[2] CYS had no contact with Mother after August 2023.

Father, on the other hand, had sporadic contact with CYS throughout the history of this case. At first, his contact was minimal. He remained incarcerated until August 25, 2023, and was again incarcerated from November 17, 2023, to February 16, 2024. During Father's interim release he had no supervised visits with J.A.M. because he did not communicate with CYS. Upon his second release in February 2024, Father initially reported to CYS but failed to stay in contact with the agency. Therefore, no visitations were scheduled. Following his release, his whereabouts were at times unknown, and his housing was not stable.

CYS utilized Clarvida to initially facilitate supervised visitations with J.A.M. for both parents, but Clarvida closed its services on October 31, 2023, because neither parent responded to attempted communications. However, in August 2024, Father exhibited a renewed interest in reunification. CYS scheduled six supervised visits in September and October before the underlying petition was filed on October 24, 2024. Father tested positive for marijuana multiple times that fall,[3] and one of the scheduled visits was

_____

[2] At some point thereafter, D.G. also moved in with Foster Mother. At the time of the termination hearing, both sisters remained with Foster Mother, who is a pre-adoptive resource for J.A.M. D.G. was preparing to attend college.

[3] Father did not have a prescription for medical marijuana.

cancelled because he also tested positive for amphetamines and methamphetamines. Ultimately, he had three visitations with J.A.M. during that period. The interactions were positive and CYS had no concerns in that regard.

As for the court-ordered services necessary for reunification, Father successfully completed his anger management sessions during his incarceration, but did not complete the virtual parenting curriculum. He began the parenting program in March 2024, attended the first four classes, ceased communication for several months, and did not resume until November, which was one month after CYS filed a petition to terminate his parental rights. He attended three classes in November, none in December, and one in January. Although Father actively participated when he attended, by the time of the termination hearing he still had four classes outstanding.

The court held a termination hearing for both parents on January 29, 2025.[4] CYS presented Christine Steidle from Mainstream Counseling, Kaleigh Goss from Clarvida, and Scott Fritz from CYS, as witnesses to establish its case against Father and Mother. Father testified on his own behalf. Attorney Covell represented to the court that J.A.M. understood Father did not have "the ability to be her primary caretaker" but she "very much wants to continue to have . . . a relationship with" him. **See** N.T. Hearing, 1/29/25, at 51. At the same time, "[s]he also very much is comfortable and wants to stay and

_____

[4] Andrea L. Lehman, Esquire, represented J.A.M. as her guardian *ad litem* ("GAL"), and Robert Covell, Esquire, acted as her legal counsel.

wants to be adopted by [F]oster [M]other." *Id*. While her GAL echoed the desire to continue to see Father, she also noted the strong bond J.A.M. has with Foster Mother, who has cared for her since August 2023. *Id*. at 52. In the end, she opined that termination was in J.A.M.'s best interests to achieve permanency. *Id*. at 52-53.

At the conclusion of the hearing, the court terminated Mother's parental rights. However, in light of J.A.M.'s wishes to maintain a relationship with Father, it took Father's petition under advisement to allow CYS and Father to submit proposed findings of fact and conclusions of law. CYS submitted a response in support of termination; Father did not offer the court any proposed findings. Thereafter, the court entered a decree terminating Father's parental rights involuntarily pursuant to 23 Pa.C.S. § 2511(a)(8) and (b).

This timely appeal followed. Both Father and the orphans' court complied with the requirements of Pa.R.A.P. 1925. In this Court, Father presents a single issue for our consideration: "Whether the [orphans'] court erred in terminating [Father]'s parental rights to [J.A.M.], because the agency failed to meet its burden by clear and convincing evidence, especially in light of the close bond between [Father] and [J.A.M.]"[5] Father's brief at 3 (some capitalization altered).

_____

[5] The GAL submitted a brief in favor of termination.

Appeals from termination decrees are governed by the following legal principles:

> [A]ppellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 48 (Pa.Super. 2024) (cleaned up). Termination unfolds in two parts:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in § 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to § 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

- 5 -

We have defined clear and convincing evidence as that which is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Id*. at 48–49 (cleaned up).

The court terminated Father's parental rights pursuant to § 2511(a)(8) and (b), which provide as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

Here, Father does not challenge the court's findings as to § 2511(a)(8). Therefore, we proceed directly to § 2511(b). *See In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa.Super. 2017) (explaining that we will not address

challenges to specific subsections of § 2511 that are not developed in the appellant's brief).  We review the court's conclusions as to this subsection mindful of the following:

> Courts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis.  We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.
>
> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability.  As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider.  The court must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents.  And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.
>
> This Court has stressed that the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.
>
> It is up to the orphans' court to consider the totality of the circumstances when performing a needs and welfare analysis. Nothing in our case law dictates that the bond between a child and parent must predominate over all other needs and welfare considerations.  Instead, after ascertaining the nature and status of the bond and effect on the child of severing it, the orphans' court must weigh any pain from breaking the bond against other considerations as to what result serves the child's needs and welfare.
>
> We have held that it is within the discretion of the orphans' court to prioritize the safety and security of children over their bonds

with their parents, and that this Court will not disturb such an assessment when the court's factual findings are supported by the record. Furthermore, in weighing the § 2511(b) bond considerations, courts must keep the ticking clock of childhood ever in mind.

*Matter of Adoption of L.C.J.W.*, 311 A.3d at 51–52 (cleaned up). Moreover, we have held that the court's analysis of the bond between a parent and a child neither requires expert testimony nor a "formal bonding evaluation[,]" but rather permits "[s]ocial workers and caseworkers [to] offer evaluations as well." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (cleaned up).

In the matter *sub judice*, Father attacks the orphans' court's § 2511(b) findings based upon an assertion that CYS "presented absolutely no evidence as to the impact that terminating his parental rights would have on [J.A.M.]" Father's brief at 7. He maintains that the bond between Father and J.A.M. was not appropriately addressed before the court terminated his parental rights. *Id*. at 10.

It is plain that Father fostered a positive relationship with J.A.M. The orphans' court considered the import of this bond but nonetheless concluded that termination was in her best interests. Indeed, the court emphasized that "the § 2511(b) analysis [wa]s of particular importance in light of the strength of the bond between J.A.M. and Father." Orphans' Court Opinion, 4/24/25, at 19. The court explained its conclusions thusly:

> J.A.M. recognizes and understands that Foster Mother, rather than Father, is the appropriate parental resource for her, but has also expressed a desire to maintain a relationship with Father. She looks forward to her visits and interactions with him, regardless of her desire and happiness to return home to Foster Mother

afterward. In an ideal world the termination and adoption statutes would allow for a trial court to enter some form of open adoption order, *sua sponte*, that would provide for continued visitation and contact between a terminated parent and child where the sort of relationship that Father and J.A.M. share exists. But this is not possible under the current law. And, quite honestly, it likely is not practicable for a host of reasons. As a result, the court must consider whether curtailing the legal relationship between Father and J.A.M. entirely, leaving the possibility of future contact solely to Foster Mother's discretion, is in the best interest of J.A.M.

Based on all of the evidence presented at the hearing, the court finds that while the bond J.A.M. shares with Father is a beneficial one, it is not "necessary and beneficial" in the same way that her bonds with Foster Mother and the other members of Foster Mother's household are. Foster Mother provides J.A.M. with the sort of stable, secure, and permanent environment she needs not only to survive, but thrive. She is there to provide the support, guidance, and encouragement J.A.M. needs, as parenting is about much more than just [providing] a roof over a child's head and food on the table. Adoption by Foster Mother will also preserve and strengthen J.A.M.'s bond with her sister, which is another important and significant family relationship for her. While D.G. will soon be headed to college, she will still be present in Foster Mother's home while on breaks, and will be in regular communication with Foster Mother (and thus J.A.M., so long as she is in the home). Additionally, while the consideration of which party is more likely to allow and provide for continuing contact is not a consideration in termination proceedings the way it is in custody matters, it can be safely assumed that Foster Mother is much more likely to allow J.A.M. to continue to have contact with Father than Father is to allow J.A.M. to have continuing contact with Foster Mother and D.G. And, should Father continue to face struggles in achieving permanency and stability for himself (which is unfortunately likely), Foster Mother is the one who is best able to serve as a resource for J.A.M. to understand and process those struggles as she sees Father go through them.

The bond that J.A.M. shares with Foster Mother is exponentially stronger and more beneficial—and thus necessary—than the bond that she shares with Father. CYS has proven, by clear and convincing evidence, that termination of Father's parental rights is in J.A.M.'s best interests.

*Id*. at 19-20 (some capitalization altered).

The court's findings are amply supported by the record, and its careful analysis demonstrates no abuse of discretion. The evidence bore out that Father has a positive relationship with J.A.M., but it is unstable. Contrarily, CYS established that Foster Mother and J.A.M. share a secure, healthy parental bond. While Father understandably wishes that the court had more heavily weighed the strength of his bond with J.A.M. in assessing J.A.M.'s best interests, it was wholly proper for the court to instead prioritize her need for stability, safety, and permanency, over a continued relationship with Father. *See Matter of Adoption of L.C.J.W.*, 311 A.3d at 51–52.

Based on the foregoing, we affirm the decree involuntarily terminating Father's parental rights as to J.A.M.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/25/2025

- 10 -