J-A19014-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: T.A.G., FATHER | : | |
| | : | No. 249 WDA 2025 |

Appeal from the Order Entered February 18, 2025
In the Court of Common Pleas of Allegheny County
Orphans' Court at No. CP-02-AP-0000069-2024

BEFORE: BOWES, J., STABILE, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:            **FILED: October 22, 2025**

T.A.G. (Father) appeals from the order which granted the petition filed by the Allegheny County Office of Children, Youth & Families (CYF) and terminated Father's parental rights to A.G. (Child).[1]  We affirm.

## Case History

Child was born in December 2022.  At the time of his birth,

> Child tested positive for fentanyl and methadone.  Mother also tested positive for the same substances.  CYF filed for an Emergency Custody Agreement ("ECA") on December 23, 2022. Child came into the agency's custody on that date.  [Mother and Father] had another son, R.G., who had been removed from their care and placed with [Foster Parents].  CYF contacted them with the hope of placing Child in their home, to which they agreed.

Orphans' Court Opinion (OCO), 4/2/25, at 3 (footnotes omitted).

---

[1] The orphans' court also terminated the parental rights of Child's mother, A.D. (Mother), who has not appealed.

On March 8, 2023, the court found Child to be dependent, and determined that aggravated circumstances existed due to Father's parental rights being terminated to R.G.[2]  Nonetheless, the court ordered goals for Father "to support reunification."  OCO at 4.  The court directed Father to complete a drug and alcohol evaluation and follow recommended treatment; participate in mental health treatment; establish stable housing; and attend supervised visits with Child.  In the months that followed, the court conducted regular review hearings and determined that Father had made minimal progress toward the goals.

On July 23, 2024, CYF petitioned to terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).  The orphans' court held a termination hearing on February 13, 2025.  CYF presented testimony from licensed psychologist, Patricia Pepe; Wesley Family Services foster care coordinator, Lafayette Jones; and CYF caseworker, Aldagisa Munoz.  Father did not appear at the hearing.  Father's counsel was present and advocated on Father's behalf, but did not present any witnesses.

*Dr. Pepe*

The parties' stipulated to Dr. Pepe's expertise in forensic psychology.  N.T., 2/13/25, at 8-9.  Dr. Pepe testified that appointments were scheduled

---

[2] The Juvenile Act's definitions of aggravated circumstances include instances when the "parental rights of the parent have been involuntarily terminated with respect to a child of the parent."  42 Pa.C.S. § 6302(5).

for her to evaluate Father, both individually and with Child, in October 2024, but Father "failed to attend." *Id.* at 10, 15.

On October 10, 2024, Dr. Pepe conducted an interactional evaluation of Child and Foster Parents. *Id.* at 9. Dr. Pepe found that Foster Parents were "an appropriate adoptive resource" for Child. *Id.* at 12. She noted that Child had been living with Foster Parents since he was six days old, and was 21 months old at the time of the evaluation. *Id.* at 13. Dr. Pepe stated:

> [Child] was exhibiting multiple bonding behaviors suggestive of a positive and primary attachment.
>
> [H]e was a very happy little guy. He was constantly smiling. He explored toys, bringing them to [F]oster [P]arents. …
>
> He was consistently interacting with both [F]oster [P]arents, and they're very encouraging. They have a very good understanding of [Child's] functioning[. T]hey exhibited very good parenting skills, and … they … provid[ed Child] with an enriched and positive environment.

*Id.* Dr. Pepe testified that Child's "primary attachment is with [F]oster [P]arents," who "are very accepting of [Child, and] want to adopt him if possible." *Id.* at 14, 16. In response to questioning by the orphans' court, Dr. Pepe noted the "very positive" impact of Child living with his biological sibling, R.G. *Id.* at 21. Dr. Pepe added that "it would be devastating for [Child] to have to leave his brother." *Id.* at 22.

*Mr. Jones*

The foster care coordinator, Mr. Jones, testified that his job is "to transport, and supervise, and report on family visits." *Id.* at 23. Mr. Jones began working with Child in February 2023, and has visited Child at least twice

a month. *Id.* at 24-25. He has supervised Child's visits with Father and visited Child at his home with Foster Parents. *Id.* When Father's counsel asked Mr. Jones to describe Child's visits with Father, Mr. Jones stated that "they are playful." *Id.* at 30. When counsel asked Mr. Jones "to assess [the bond] to the best of [his] ability," Mr. Jones stated that Child "recognizes" Father and "gets excited when [Father] arrives for visits. But, ultimately, I would say it is playful." *Id.* When CYF's counsel asked Mr. Jones "how [Child was] doing" with Foster Parents, Mr. Jones stated that Child was "doing very well," and "very bonded with not only his [biological] brother[,] but the [two] other children in the home, as well as [F]oster [P]arents." *Id.* at 24.

*Ms. Munoz*

The CYF caseworker, Ms. Munoz, testified that she had worked with the family since the inception of the case in December 2022. *Id.* at 33-34. According to Ms. Munoz, Father had not remedied the conditions which caused Child to come into CYF's care. *Id.* at 44. She testified that Father did not complete drug and alcohol or mental health treatment. *Id.* at 41-42. For example, she stated that although Father "was notified on a weekly basis" about scheduled drug screens, he "never completed any." *Id.* at 53. Ms. Munoz described Father's communication as sporadic. She stated that Father would "communicate with me sometimes," but "would go months without speaking" to her. *Id.* Ms. Munoz reiterated that CYF was unable to verify Father's sobriety, and noted that Father had not progressed to unsupervised visits with Child. *Id.* at 44.

Regarding Child, Ms. Munoz testified:

> I see him monthly, [and] he always appears to be very bonded to [F]oster [P]arents.  He seems to be very bonded to the other children in the home.  He's always very happy.  He's very affectionate towards [F]oster [P]arents, and they're very affectionate towards him as well.  [Child is] really thriving in that environment.

*Id.* at 43.  Ms. Munoz confirmed that Foster Parents were a pre-adoptive resource for Child and were meeting all of Child's needs.  *Id.* at 44.  Ms. Munoz opined:

> [Child] deserves to have permanency.  As I stated before, he's thriving in the home of [Foster Parents].  He's very happy there.  They love him so much, and you can just tell that he's a very loved child there.

*Id.* at 45.

*Child's Counsel*

Child's counsel expressed her view that Child's "best and legal interests are for him to remain stable" and "obtain permanency through adoption."[3]

*Id.* at 60.  Counsel explained:

> [Child has] been in [Foster Parents'] home his whole life. Unfortunately, [F]ather ha[s] only been able to make minimal progress on [his] goals.

---

[3] Counsel explained that there was no conflict between Child's best and legal interests because Child was two years old and "unable to state a preferred outcome."  *Id.* at 60; *see In re Adoption of K.M.G.*, 240 A.3d 1218, 1224 (Pa. 2020) (explaining that counsel may represent a child's best and legal interests when the interests do not conflict).

- 5 -

[A]s of this time, [there are] still ongoing concerns with [Father's capacity to provide parental] care, and [maintain] sobriety, and mental health stability. And [Father has not] been involved in [Child's] medical care. I believe you heard testimony that the first year and a half of [Child's] life, [Father's visitation] with [Child] was sporadic, and it's only now recently been consistent, … since about the filing of the termination petition.

*Id.* at 60-61.

The orphans' court heard closing arguments from counsel before announcing its finding that CYF had "met their burden by clear and convincing evidence." *Id.* at 61. The court added that it "probably would have [found that the burden was met] beyond a reasonable doubt, but clear and convincing evidence is the standard." *Id.* at 61-62.

On February 18, 2025, the orphans' court entered an order terminating Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8) and (b). On February 28, 2025, Father filed a timely notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

Father presents the following issues for review:

1. Did the [orphans'] court abuse its discretion and/or err as a matter of law by involuntarily terminating Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8)?

2. Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of [C]hild pursuant to 23 Pa.C.S. § 2511(b)?

Father's Brief at 3.

- 6 -

Discussion

Father argues that CYF failed to present sufficient evidence to support termination of his parental rights. He assails the orphans' court's findings of grounds for termination under Section 2511(a)(2), (5), and (8), and the court's conclusion that termination best served Child's needs and welfare under Section 2511(b).

As an appellate court, we examine whether the termination of parental rights is supported by competent evidence. *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021) (citations omitted). Our Supreme Court has explained:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the [orphans'] court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the [orphans'] court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The [orphans'] court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized [an appellate court's] deference to [orphans'] courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). The orphans' court "is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

When considering whether to terminate a parent's rights, the orphans' court must first determine whether there are grounds for termination under 23 Pa.C.S. § 2511(a). The evidence must be clear and convincing. ***See In re T.S.M.***, ***supra***. If the court finds grounds for termination under Section 2511(a), it must then consider the child's needs and welfare under Section 2511(b). We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In this case, we examine grounds for termination under Section 2511(a)(8).

*Section 2511(a)(8)*

The Adoption Act provides:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

...

(8) The child has been removed from the care of the parent by the court…, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(8).

Under Section 2511(a)(8), a party must establish: (1) that the child has been removed from the care of the parent for at least twelve months; (2) that the conditions which led to the removal or placement of the child still exist;

- 8 -

and (3) that termination of parental rights best serves the needs and welfare of the child.[4] ***Matter of Adoption of L.C.J.W.***, 311 A.3d 41, 49 (Pa. Super. 2024). Section 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the child's placement. ***Id.***

Father recognizes that Child has been in CYF's care since December 2022. However, he emphasizes that the "conditions that initially led to Child's removal were primarily associated with Mother." Father's Brief at 14. Father claims there "is no evidence that Father's behaviors were a factor at the time of removal, and he could eventually be caring for Child after additional services." ***Id.*** Father also asserts that there was insufficient evidence to prove that termination best serves Child's needs and welfare. ***Id.*** The record indicates otherwise.

When Child came into CYF's care, the juvenile court determined that Father was unable to care for Child due to his substance abuse, mental health, and housing issues. Thus, the court established reunification goals and ordered services for Father. Approximately three years later, at the time of the termination hearing, the orphans' court found that Father had "not

---

[4] We have explained that Section 2511(a)(8) "explicitly requires an evaluation of the 'needs and welfare of the child' prior to proceeding to Section 2511(b), which focuses on the 'developmental, physical and emotional needs and welfare of the child.'" ***In re C.L.G.***, 956 A.2d 999, 1008 (Pa. Super. 2008). "Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent." ***Id.*** at 1008-09.

remedied the reasons that [caused C]hild [to] come into care." N.T. at 62.

The court stated:

> The largest issue for the [c]ourt is, obviously, sobriety. There has been no proof that … Father ha[s] demonstrated a period of sobriety, which would have led this [c]ourt to believe that [Father had] met the goal to a point where … reunification would be possible in the near future. And without that, as well as the mental health [issue], the [c]ourt has grave concerns….

*Id.* at 63. The court concluded that Father "did not successfully complete any goal." OCO at 12. The court explained the basis for its conclusion:

> [Ms.] Munoz testified that Father did not provide the agency with any documentation that he successfully completed any drug and alcohol treatment.
>
> Father failed to meet his drug screening goal. The court heard testimony from [Ms.] Munoz that Father registered for the screenings, but left the facility when requested to provide a screen.
>
> Father was called to screen at [the Allegheny County Health Department] 15 times between October 2023 and May 2024[,] and did not attend any screens. Father was provided permission to screen at another facility called Narcotic Addiction Treatment Program (NATP) at [the University of Pittsburgh Medical Center]. Father attempted to demonstrate compliance with treatment. According to Ms. Munoz's testimony though, Father only provided two letters from NATP, one on December 18, 2023[,] and one on August 27, 2024, a month after the filing of the [termination petition]. The court was not persuaded. The court found that Father did not meet this goal as the court may not consider any effort by the parent to remedy the conditions … after notice of the [termination] petition has been filed.
>
> Father failed to meet his mental health goal. Father did not provide the agency with any documentation that he successfully completed mental health treatment according to the testimony of Ms. Munoz. Likewise, Father did not maintain consistent communication with CYF.

*Id.* at 12-13 (citation and footnotes omitted). As Father did not appear at the termination hearing, the court noted that he "provided no credible evidence or testimony to demonstrate that he addressed the goals relevant to Child's removal." *Id.* at 13.

The orphans' court also considered Child's needs and welfare in the context of Section 2511(a)(8), stating that it "accepted testimony from [Ms.] Munoz," who "believes, as does the court, that based on the interactions and observations of the agency, termination … would best serve the needs and welfare of Child because Father has not remedied the conditions that led to Child's removal, such as the ongoing sobriety concerns which have persisted unabated." *Id.* at 14-15. Our review reveals ample support for the orphans' court's termination of Father's parental rights pursuant to Section 2511(a)(8).

*Section 2511(b)*

Father maintains that the "record does not include sufficient evidence to support a determination that termination … best serves the needs and welfare of Child." Father's Brief at 15. Father asserts that the record "clearly established that Child and Father share an important and meaningful bond." *Id.* at 16. However, Father does not cite any evidence to support his assertion. He makes the conclusory statement that Child "deserves to have the benefits of his relationship with Father preserved," and the "only way to ensure this benefit to Child is to restore Father's parental rights." *Id.* This argument is unavailing.

At the end of the termination hearing, the orphans' court expressed that it "was not convinced" that a bond existed between Child and Father, who "never had [C]hild in [his] custody or care." N.T. at 63. The court referred to Dr. Pepe's expert testimony that Child's "primary attachment" was to Foster Parents, "and any severing of that bond would, in fact, be detrimental to [C]hild." *Id.* at 63-64.

The orphans' court further explained:

> The court gave primary consideration to the developmental, physical, and emotional needs and welfare of Child. The court examined whether there was an emotional bond between Father and Child as part of its best-interest analysis, but that is only one of many factors the court considered in making its determination. The court also examined the safety needs of Child as well as other intangibles that Child has with [F]oster [P]arents, such as love, comfort, security and stability. The court's determination included the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on Child. Although evidence of a bond may barely exist, the bond is outweighed by Father's inability to remedy the causes of Child's placement, and by Child's need for permanence and stability.
>
> … The court considered and found that Child will not suffer extreme and emotional consequences by severing the bond between Child and Father. Conversely, Dr. Pepe's opinion, which the court accepted, was that removal of Child from the foster home would be … detrimental.

OCO at 20-21. The evidence supports the orphans' court's finding "that the developmental, physical, and emotional needs and welfare of Child would be best served by terminating Father's parental rights under 23 Pa.C.S. § 2511(b)." *Id.* at 21-22.

For the reasons discussed above, the orphans' court did not err or abuse its discretion in granting CYF's petition and terminating Father's parental rights.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

10/22/2025