J-S46003-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.A.M.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.L.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 822 WDA 2025 |

Appeal from the Decree Entered June 5, 2025
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
No. 38 in Adoption, 2025

| | | |
|---|---|---|
| IN THE INTEREST OF: D.L.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.L.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 823 WDA 2025 |

Appeal from the Decree Entered June 5, 2025
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
No. 37 in Adoption, 2025

BEFORE:  BOWES, J., NICHOLS, J., and KING, J.

MEMORANDUM BY BOWES, J.:　　　　　　**FILED: March 3, 2026**

M.L.H. ("Mother") appeals from the decrees involuntarily terminating her parental rights as to D.L.S., born in 2016, and A.A.M.S., born in 2018.[1] We affirm.

_____

[1] This Court consolidated these matters *sua sponte*.  Additionally, the orphans' court terminated the biological father's parental rights.  However, he has not appealed that decree.

We glean the following facts from the certified record. The Erie County Office of Children and Youth (the "Agency") became involved with Mother and the children's two older half-siblings in 2010.[2] Bridgette Gerber-Winschel was assigned as the family's caseworker. The Agency had repeated concerns of domestic violence, substance abuse, lack of basic needs, inadequate housing, uncleanliness, sexual abuse, and inappropriate discipline. Beginning in October 2016, the Agency and Ms. Gerber-Winschel substantially increased their oversight of Mother and her children when it received a referral alleging that D.L.S. and A.A.M.S.'s father had a psychotic episode and attempted to suffocate D.L.S. with a stuffed animal. The father subsequently left the home.

Upon his return in August 2017, the Agency became aware of a physical altercation between him and maternal grandmother in the presence of D.L.S. The Agency was involved with the family once more in September 2021 based upon concerns of substance abuse, domestic violence, inadequate housing, lack of basic needs, and parental conduct placing the children in danger. At that time, Mother admitted to abusing drugs and engaging in domestic violence with her then-paramour. In November 2022, Child Protective Services reported to the Agency that a different ex-boyfriend of Mother

_____

[2] The half-siblings, born in 2012 and 2009, were likewise removed from Mother's care at the same time as D.L.S. and A.A.M.S. Their permanency goals, based on their ages and preferences, was permanent legal custodianship. Accordingly, they are not involved in these appeals.

sexually abused the children's half-sister, which was documented in an indicated report.

Ms. Gerber-Winschel received the most recent referral on August 21, 2024. Notably, Mother and her new paramour were using illegal substances in front of the children, who were left to their own devices. They lacked food, were not bathed, and had severe cases of lice. In fact, A.A.M.S. required treatment at a hospital. The home was also crawling with fruit flies, bed bugs, and cockroaches, and showed signs of hoarding. Clutter was covering all areas of the home, to the point where it was difficult to open doors.

Further, there was an excess of pets, with urine and feces coating the floors and various pens and crates. Animal Enforcement removed several animals from the home. Mother also tested positive for methamphetamine and amphetamine. The Agency had additionally received reports indicating that electricity had been shut off in Mother's house twice, despite her receiving $4,000 in social security benefits for the children and SNAP benefits, and working part-time for Amazon. The Agency was further aware that Mother occasionally left the children with maternal grandmother and maternal aunt, who lived in the same home, so that they had access to food and electricity. However, maternal grandmother and aunt had indicated reports of domestic violence against the children. Maternal grandmother was also known to abuse drugs.

The Agency unsuccessfully attempted to work with Mother until October 1, 2024, when it sought and obtained an emergency protective order to remove the children. A shelter care hearing ensued on October 3, 2024, wherein Mother stipulated to the Agency's continued care of the children. On October 4, 2024, the Agency filed a dependency petition, and the court scheduled an adjudication hearing on October 15, 2024. The hearing officer recommended that the children be adjudicated dependent and remain in the custody of the Agency, which the court approved on October 24, 2024. The disposition hearing took place that day, and Mother agreed to a treatment plan involving, *inter alia*, participating in a drug and alcohol assessment, refraining from using drugs and alcohol, partaking in an approved parenting program, completing a mental health assessment and complying with all recommendations thereto, and obtaining safe and stable housing.

The first permanency review hearing took place on January 13, 2025. The Agency reported that Mother was undergoing mental health treatment, but otherwise had not demonstrated stability, and her home remained in an unkempt condition. The Agency concluded that Mother made moderate progress in the treatment plan, but failed to alleviate any circumstances that led to the children's removal. The children's placement goal remained reunification concurrent with adoption.

During this time, Alexis Dean of the Erie Homes for Children and Adults, Project First Step, provided Mother with cleaning services beginning on

January 31, 2025. The clutter plaguing the home led Ms. Dean to conclude that Mother was hoarding items. She also observed numerous animals that were missing fur and potentially had fleas, with urine and feces covering the bottom of their kennels and pens. After Mother cancelled their next meeting on February 3, Ms. Dean returned to the home on February 18, 2025, finding that it remained in the same condition. Mother did not possess any cleaning supplies. Before Ms. Dean could provide such materials, Mother was evicted from the home. Ms. Dean was ultimately not able to make any progress towards making the home safe.

During Mother's visits with the children, Cassandra Angelotti, a social service aide with the Agency, worked together with Ms. Gerber-Winschel to provide hands-on assistance. The appointments started with Mother, A.A.M.S., D.L.S, and their two older siblings, but were shortly thereafter reduced to include only A.A.M.S. and D.L.S. because Mother was unable to manage all four children. As to A.A.M.S., Mother treated her as the favorite child, and A.A.M.S. struggled with school structure, infant-like behaviors, and relationships with her siblings. D.L.S. frequently became frustrated because he could not coherently express his thoughts and emotions. He also binged meals because he suffered from food insecurity. Additionally, he read at the eleventh percentile for his age and frequently misbehaved in school. Mother could not anticipate D.L.S.'s problematic behaviors and tended to only give him attention when he acted out. Ms. Angelotti and Ms. Gerber-Winschel were

unable to advance Mother to unsupervised visits because she failed to control the children's behavior. In the aides' experience, it was unusual for a parent to never advance to unsupervised visits and require two people for hands-on assistance.

At the following permanency review hearing on April 2, 2025, the evidence established that Mother made moderate progress with her treatment plan, but failed to alleviate any problematic circumstances. Before Mother was evicted, Ms. Gerber-Winschel attempted to complete a home visit, but Mother did not allow her to enter the house. Nevertheless, Ms. Gerber-Winschel noted that the outside of the home remained in deplorable condition. While Mother attended her mental health program appointments, she continued to deny her need for anger management services or medication. Conversely, the children demonstrated significant improvement in their emotional and physical health while in pre-adoptive foster care. A.A.M.S. was placed in the same foster home as her half-siblings, while D.L.S. remained with a separate foster family to receive specialized care. However, he had frequent visits with his siblings. The children's permanency goal was accordingly changed to adoption.

The Agency filed the instant petition for involuntary termination of Mother's parental rights as to D.L.S. and A.A.M.S. on April 17, 2025, seeking

termination pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (b). The court appointed counsel for Mother and the children.[3]

At the June 3, 2025 termination hearing, Ms. Gerber-Winschel, Ms. Angelotti, and Ms. Dean testified consistently with the above facts. The Agency also presented Peter von Korff, Ph.D., as an expert in clinical psychology. He conducted an evaluation of Mother and a bonding assessment between her and the children. Mother expressed to Dr. von Korff that she believed she was adequately raising the children, and that the Agency's intervention was not "warranted or helpful." N.T., 6/3/25, at 13. She also tended to place blame on "men that she's been involved with" and the children's biological father. *Id*. Dr. von Korff further recognized a pattern where Mother quit mental health treatment when she began to show improvement.

As to her relationship with the children, Dr. von Korff observed that Mother struggled to anticipate or appreciate D.L.S.'s worrisome behavior, and he was "on his own until he[ was] in trouble and in misbehavior, and then he [would receive] her attention." *Id*. at 19. Additionally, Mother idealized A.A.M.S. and saw her as "a kind of sweet, idyllic, and self-gratifying other . . . [and] not a relationship in which the child is described . . . as having

_____

[3] Abigal Groner, Esquire served as guardian *ad litem* and court-appointed counsel for both children in conformity with 23 Pa.C.S. § 2313(a). The orphans' court found that Attorney Groner's dual representation did not create a conflict between the children's legal interest and best interests.

independent qualities that are . . . addressed in the parent/child relationship." *Id*. at 20. Ultimately, he opined that Mother was in need of continuous mental health treatment, and the bond between her and the children was "limited and superficial." *Id*. at 24.

In addition, Ms. Gerber-Winschel informed the court that two weeks prior to the hearing, Mother was involved in an incident at a school concert for one of the children's half-siblings. Mother had approached the foster mother and "yelled in her face, F you, you F-ing bitch, I still have my F-ing rights." *Id*. at 79. D.L.S. was present and was frightened by the incident. He had also expressed concern to Ms. Gerber-Winschel that Mother would appear at his foster home.

Moreover, Ms. Gerber-Winschel reported that the children had continued to make great strides in improving their behavioral and emotional health. In fact, as to D.L.S., she attested that she had "never seen another kid make that kind of improvement in that short of a time." *Id*. at 75. Specifically, he was no longer binge-eating during meals, his behavioral outbursts had significantly lessened, he was sleeping regularly, and he was scheduled to return to his grade-level classroom for the upcoming school year. A.A.M.S.'s behaviors were also reported to be in the "normal range" for her age, she made friends, began to enjoy school, and improved her relationship with her siblings. Both children were up to date medically and had no reports of lice, and they looked to their foster families for comfort and security. Finally, Ms.

Gerber-Winschel confirmed that it would not be detrimental to the children to permanently remove them from Mother's care, and it would be in their best interest.

Mother opted to testify in opposition to the petition. She averred that she made progress with alleviating the circumstances that led to her children's displacement, and that she completed every task the Agency asked of her. Mother affirmed that she received $4,000 monthly in social security benefits for the children and SNAP benefits, and worked part-time for Amazon. She explained, though, that she lost her benefits when the children were removed, which is why she could not pay her bills or rent. She also stated that she was unable to clean her home because she was evicted.

Further, Mother attested that she was participating in her mental health treatment program and was diagnosed with depression, anxiety, post-traumatic stress disorder, and bipolar disorder. However, she did not take all her medications because she had allergic reactions, including hives, to some of them. Finally, she acknowledged that at the time of the hearing, she had recently been depicted in photos and posts on social media indicating that she was in a relationship with a known sexual offender, although she claimed that they were only friends.

Finally, Attorney Groner explained that both of the children were thriving with their foster families, and it would be in their best interest to remain in their care. At the conclusion of the hearing, the court found that the Agency

met its burden and terminated Mother's parental rights pursuant to § 2511(a)(1), (2), (5), and (b), and later issued decrees stating the same. Mother timely appealed and simultaneously submitted her statement of errors in accordance with Pa.R.A.P. 1925(a)(2)(i) and (b). The court authored a responsive Rule 1925(a) opinion.

Mother raises the following issues for our consideration:

I.    Whether the [orphans'] court erred and abused its discretion by terminating [Mother]'s parental rights under 23 Pa.C.S. § 2511(a)(1), (a)(2), (a)(5), and (b) without clear and convincing evidence that the statutory prerequisites were met.

II.    Whether the court erred by failing to conduct a legally adequate bonding and best-interest analysis under 23 Pa.C.S. § 2511(b).

Mother's brief at 2.

This Court's standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

- 10 -

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support.  Termination of parental rights has significant and permanent consequences for both the parent and child.  As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

***Interest of Z.N.B.***, 327 A.3d 241, 247-48 (Pa.Super. 2024) (cleaned up).

Section 2511 of the Adoption Act governs the termination of parental rights, which requires a bifurcated analysis focusing first on one of the eleven potential grounds that may warrant termination.  ***See*** 23 Pa.C.S. § 2511(a). If the orphans' court concludes that the petitioner has established one of these subsections by clear and convincing evidence, the court then proceeds to the second segment of the analysis, § 2511(b), which concentrates on the child's developmental, physical, and emotional needs and welfare.  ***See Interest of Z.N.B.***, 327 A.3d at 248.

Our analysis will focus upon § 2511(a)(2) and (b), which provide grounds for termination as follows:

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .

- 11 -

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511.

To demonstrate a sufficient basis for termination pursuant to § 2511(a)(2), the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa.Super. 2021). The grounds for termination of parental rights in accordance with § 2511(a)(2) are not limited to affirmative misconduct, but may also "include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of M.A.B.*, 166 A.3d 434, 444 (Pa.Super. 2017) (citation omitted). In that vein, "[a] parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *Id*. at 443 (cleaned up). Overall, "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re Adoption of A.H.*, 247 A.3d at 443.

Mother contends that the "record does not establish, by clear and convincing evidence, . . . that incapacity would not be remedied[.]" Mother's brief at 4. She points to Dr. von Korff's recommendation of "attachment-based counseling and education, indicating that progress was possible." *Id*. at 4. Mother also avers that "[t]estimony from [Ms. Angelotti, Ms. Dean, and Ms. Gerber-Winschel] reflected participation and cooperation with services prior to eviction, not abandonment of parental responsibilities[.]" *Id*. Further, she asserts that "[n]o witness testified that [Mother] refused treatment or was incapable of improvement[.]" *Id*. at 4-5. While acknowledging that the Agency presented evidence "of cluttered housing and pet management issues," Mother argues that this evidence "does not meet the statutory threshold of repeated and continued incapacity contemplated by § 2511(a)(2)." *Id*. at 5 (cleaned up).

In its Rule 1925(a) opinion, the orphans' court explained its determination as to this subsection thusly:

> In the instant case, the record demonstrates by clear and convincing evidence that termination of Mother's parental rights was proper. Even in the days leading up to the [hearing], knowing what was coming, Mother was unable to demonstrate stable mental health and good decision making, as evidenced by her behavior toward the children's foster mother at [the half-sibling's] school concert. Additionally, despite fully acknowledging that the men in her life were an issue; and telling Dr. von Korff that they were the reason the children were not in her care; Mother continued to choose men . . . [who] could pose a danger to the children. Mother was well aware that [the man she was seen with on social media] was a registered sex offender, yet, at a time when she should have been focused on her children and not men, she chose his "friendship."

- 13 -

Ultimately, the testimony illustrated that while Mother was able to achieve and maintain sobriety in the months leading up to the Agency's filing of the petition, she was never able to internalize, and therefore [was] unable to alleviate[,] the issues that led to the children's dependency adjudication and removal from her care.

Orphans' Court Opinion, 9/22/25, at 20 (some capitalization altered).

The certified record supports the court's findings. The Agency has been involved with Mother for more than fifteen years with persistent concerns of housing insecurity, drug abuse, cleanliness, lack of adequate nourishment, mental health, and domestic and sexual violence. These issues have only been "repeated and continued" since the inception of the Agency's involvement. *See In re Adoption of A.H.*, 247 A.3d at 443. Specifically, when the children were removed from Mother's care in October 2024, they had severe cases of lice, behavioral and developmental issues, were malnourished, and lived in a cluttered and infested home, sometimes without electricity or food. The Agency therefore established that Mother has been unable to provide the children with "essential parental care, control or subsistence[.]" *Id*.

Furthermore, although Mother is to be commended for maintaining sobriety and participating in mental health treatment, the Agency has nevertheless demonstrated that her neglect of the children "cannot or will not be remedied." *Id*. During visits, Mother was repeatedly incapable of controlling the children or properly disciplining them. Ms. Angelotti and Ms.

- 14 -

Gerber-Winchell confirmed that it was unusual for a parent to not only be unable to advance to unsupervised visits, but to require more than one aide's assistance. Mother also did not make any efforts to clean her unsafe home after Ms. Dean's first visit. Before her eviction, Mother had two weeks to demonstrate any progress. She then relocated to the home of maternal grandmother and aunt, who were both known to be abusive to the children. Mother also threatened the foster mother of the children's half-sibling in the presence of D.L.S., who became concerned that she would do the same with his foster family. Most alarmingly, Mother previously exposed her children to indicated perpetrators of abuse, and showed her willingness to continue to engage in relationships with partners who posed a danger to the children. Mother has thus failed to make "diligent efforts toward the reasonably prompt assumption of full parental duties." *Id*. In sum, the record supports the court's determination that the Agency met their burden pursuant to § 2511(a)(2).

We now turn to § 2511(b), which is considered from the child's perspective. *See Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 51 (Pa.Super. 2024). Importantly, we must place the child's "developmental, physical, and emotional needs and welfare above concerns for the parent." *Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023). This determination "must be made on a case-by-case basis . . . with an eye to the best interests and the needs and welfare of the particular children involved." *Id*. at 1105-06

(cleaned up). Additionally, "[t]he court must consider whether . . . the child has any bond with the biological parent, . . . [and] must conduct an analysis of that bond, which is not always an easy task." ***Matter of Adoption of L.C.J.W.***, 311 A.3d at 52.

The orphans' court provided the following assessment:

> While the children love their Mother, the testimony at the [hearing], notably Dr. von Korff and Ms. Gerber-Winschel, demonstrated that Mother is unable to parent them in a safe, stable[,] and consistent manner. These [c]hildren were living in a filthy, infested home with Mother, where they were essentially neglected because Mother was unable to put their needs before her own. They are currently thriving emotionally, physically, behaviorally[,] and educationally in their current placements. They deserve to just be [c]hildren and not have to worry about fending off insects and Mother's paramours in their own home, a concept which, despite sobriety and mental health treatment, Mother still does not seem to grasp. Therefore, the termination of Mother's parental rights is in their best interest.

Orphans' Court Opinion, 9/22/25, at 20-21.

Mother laments the court's "cursory" analysis as to § 2511(b). ***See*** Mother's brief at 6. She alleges that Dr. von Korff was the only expert who evaluated the bond between Mother and the children, and there was no "independent bonding evaluation or expert report [that] measured the strength of attachment or potential harm from severance." ***Id***. at 5. Mother states that Dr. von Korff actually "acknowledged observable affection, comfort, and warmth between Appellant and the children" and "that the relationships, while insecure, were affectionate." ***Id***. at 5-6. She contends that the court's analysis was "legally insufficient" because it lacked a "specific

inquiry into the children's emotional needs" and neglected to acknowledge that the testimony failed to address "the consequences of permanent severance." *Id*. at 6.

Upon review, we conclude that the evidence supports the determination of the orphans' court. When the Agency removed D.L.S. and A.A.M.S. from Mother's care, they were struggling to assimilate with their peers, suffering from severe cases of lice, lacking adequate food, and performing below their grade levels. D.L.S. specifically had behavioral and anger issues and gorged his meals, while A.A.M.S. acted infantile despite being six years of age, did not get along with her siblings, and required a hospital stay for her lice infection. Once the children were removed from Mother's care and placed in their pre-adoptive foster homes, they made momentous advances in their physical and mental health. Ms. Gerber-Winschel attested that both children were thriving, and that she had never seen a child progress as rapidly as D.L.S. She also confirmed that both children were bonded with their respective foster families, and relied upon them for support and safety.

Additionally, Dr. von Korff's examination revealed that while Mother and the children shared a bond, it was "limited and superficial." N.T., 6/3/25, at 24. Ms. Gerber-Winschel and Attorney Groner opined that the termination of Mother's rights would best serve the children. Prioritizing the children's "developmental, physical, and emotional needs and welfare[,]" it is clear that

the court did not abuse its discretion in terminating Mother's parental rights. *See Interest of K.T.*, 296 A.3d at 1105.

Based upon the foregoing, we conclude that the evidence supports the findings of the orphans' court pursuant to § 2511(a)(2) and (b). Hence, we affirm the termination decrees.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

3/3/2026